UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| BRANDENBURG TELEPHONE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:09-cv-109-CHB |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| SPRINT COMMUNICATIONS CO., L.P., | ) ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiff

Brandenburg Telephone Company ("Brandenburg"), [R. 101], and the Motion for Partial

Summary Judgment filed by Defendant Sprint Communications Company, L.P. ("Sprint"),

[R. 102]. Sprint has also filed a Motion for Judicial Notice, [R. 100]. The parties have filed their

respective response and reply briefs to the pending motions. *See* [R. 103; R. 104; R. 105; R. 106;

R. 107; R. 108]. These motions are therefore fully briefed and ripe for review.

I.   **BACKGROUND**

A.  **Introduction**

Though the procedural posture and underlying state court proceedings in this case are

painfully complicated and lengthy, the core dispute is relatively simple. Sprint claims

Brandenburg overcharged it for connecting long distance calls placed by Sprint's customers.

Specifically, Sprint claims that between 2002 and 2009, Brandenburg incorrectly characterized

these calls as *intrastate* calls by using an outdated methodology for categorizing the calls'

jurisdictional nature, and, consequently, applied the higher access charges under the state tariff

that governed *intrastate* calls at the time. Sprint argues Brandenburg should have employed an

updated methodology for determining the jurisdictional nature of the calls, which would have rendered the calls *interstate* and subject to the lower access charges under the federal tariff.

Sprint filed an Administrative Complaint with the Kentucky Public Service Commission ("PSC") in 2008 to sort it out. Shortly thereafter, Brandenburg sued in Meade Circuit Court, and Sprint removed the action to this Court based on diversity jurisdiction. Sprint told this Court that the dispute could and should be decided by the PSC and asked this Court to dismiss or stay this action. The Court stayed the case for a decade. The PSC ruled in Sprint's favor, finding the updated jurisdictional methodology applied, rendering the calls at issue not *intrastate,* but rather *interstate* and subject to the federal tariff's lower rates. On appeal, the state courts overturned that ruling in part, holding that it would be unlawful to retroactively change the methodology Brandenburg used to categorize the calls as *intrastate*. The effect of the state court ruling meant the 2002–2009 calls remained subject to the state tariff's higher rates for *intrastate* calls. The state proceedings finally concluded in 2020. Now, having lost in state court, Sprint returns to this Court and argues that the state court rulings are preempted by federal law, which compels this Court to designate the calls as *interstate*, subject to the lower tariff.

Brandenburg argues a scattershot of reasons why Sprint should not be allowed to argue federal preemption in this Court, after losing in state court—collateral estoppel, res judicata, judicial estoppel, statute of limitations, and that the *Rooker-Feldman* doctrine divests the Court of jurisdiction. As outlined below, some of these theories are near misses, but nonetheless misses. The Court agrees, however, that res judicata, judicial estoppel, and the statute of limitations land squarely to bar Sprint's preemption counterclaims and defenses.

Why judicial estoppel? Early on in this action, Sprint convinced this Court that the dispute, other than enforcing any damages award flowing from the PSC action, should be

resolved through the PSC's administrative process because the "PSC has full authority to interpret Brandenburg's intrastate tariff and thereby resolve the issues that separate the parties." [R. 14, p. 3]. Accepting Sprint's position, this Court stayed the case for a decade while Sprint and Brandenburg litigated in the PSC and state court. After losing in state court, Sprint returns to this Court and now argues that federal preemption applies to compel this Court to overturn the state court outcome and find the calls are *interstate*, subject to the lower federal tariff. Sprint further argues that its federal preemption counterclaims ripened only after the state court action became final in 2020. But, as explained below, Sprint knew all along that determining the jurisdictional nature of the calls implicated *both* state and federal law. So why did Sprint insist on litigating before the PSC and state courts? To enjoy the more generous look-back period under state law and avoid the two-year federal statute of limitations. Indeed, at the time Sprint filed its PSC complaint in 2008, most of the disputed charges (dating back to 2002) would have been time-barred under the federal statute.

For the reasons set forth below, the Court finds that Sprint's preemption arguments are barred by the doctrine of res judicata because those very claims could have been decided in the state proceeding. Further, the equitable doctrine of judicial estoppel prevents Sprint from changing positions now and arguing that federal preemption requires this Court to reach a different outcome. Lastly, even if res judicata and judicial estoppel were inapplicable, Sprint failed to bring its federal preemption counterclaims until 2020, and such claims are time-barred by the same federal limitations period Sprint attempted to side-step by litigating through the PSC.

**B.  Federal and State Tariffs Affecting Sprint and Brandenburg**

Sprint is an Interexchange Carrier ("IXC") that carries interexchange (or long-distance)[1] telephone traffic for Sprint PCS and Nextel, two Commercial Mobile Radio Service ("CMRS") providers.[2] *See, e.g.*, *Sprint Communications Co., L.P. v. Brandenburg Telephone Co.*, Nos. 2017-CA-534-MR, 2017-CA-555-MR, 2019 WL 4565546, *2 (Ky. App. Sept. 20, 2019) (hereafter "*Brandenburg II*"). When customers of these CMRS providers place a wireless call, those calls are carried over Sprint's long-distance network. *Id.* However, "[c]alls made by Sprint's customers to customers of other service providers must be 'handed off' to another carrier before reaching their final destination or termination point—the called party." *Id.* Sprint therefore relies on local carriers, known as "local exchange carriers" or "LECs," to deliver its long-distance calls to their final recipient.

Brandenburg is one such LEC. More specifically, Brandenburg is a rural LEC that terminates wireless long-distance calls that include CMRS-originated traffic—like the calls carried over Sprint's long-distance network. *Id.* Thus, when Sprint sends a call to Brandenburg's area, Brandenburg "receives" it and connects the call to its intended local recipient. *Id.*

Sprint pays Brandenburg certain "switched access charges" for these services, in accordance with the applicable state and federal tariffs. *Id.* Whether the state or federal tariff applies depends on whether the call is intrastate—meaning it originates and terminates in the same state—or interstate, meaning the call originates in one state but is terminated in another. *Id.* Purely *intrastate* services are billed through the Kentucky PSC in the Duo County Telephone Cooperative Corp., Inc. PSC KY Tariff No. 2A ("the Duo County tariff"). *Id.* However, the rates,

---

[1] "'Interexchange traffic' is a term of art which correlates to what consumers would traditionally consider to be 'long-distance' telephone service for which 'toll charges' are incurred; an interexchange carrier (IXC) is a long-distance carrier who provides intrastate or interstate long-distance communications services between local exchange areas." *Iowa Network Servs. v. Quest Corp.*, 363 F.3d 683, 688 (8th Cir. 2004).

[2] CMRS "providers offer radio communication services between land stations and mobile receivers." *Iowa Network Servs.*, 363 F.3d at 686–87 (citing 47 C.F.R. § 20.3).

terms, and conditions of Brandenburg's *interstate* services are defined by the Federal Communications Commission ("FCC") in the National Exchange Carrier Association Tariff No. 5 ("the NECA tariff"). *Id.* For the time period relevant to this case, the NECA tariff access charges for connecting interstate calls were cheaper than the Duo County tariff's rates for connecting intrastate calls. *Id.*

To determine which tariff applies, Brandenburg must first ascertain whether the incoming call is an interstate or intrastate one. *Id.* In other words, it must determine the "jurisdictional character" of the call. *See Global Crossing Telecommunications, Inc. v. Southwestern Bell Telephone, L.C.*, No. 4:04-CV-00319-ERW, 2006 WL 8458971, at *1 (E.D. Mo. Sept. 12, 2006) ("Whether a call is interstate or intrastate is referred to as its jurisdictional character."). During the relevant time periods, the Duo County tariff provided the following guidance on determining the jurisdictional character of a call:

> For Switched Access Service, the Telephone Company cannot in all cases determine the jurisdictional nature of customer traffic and its related access minutes. In such cases the customer may be called upon to provide a projected estimate of its traffic, split between the interstate and intrastate jurisdictions.

[R. 100-1, p. 161]. The tariff then provides regulations that "govern such estimates, their reporting by the customer and cases whether the Telephone Company will develop jurisdictional percentages." *Id.* Relevant to this case, those regulations state,

> When originating call details are insufficient to determine the jurisdiction for the call, the customer shall supply the projected interstate percentage or authorize the Telephone Company to use the Telephone Company developed percentage. This percentage shall be used by the Telephone Company as the projected interstate percentage for originating and terminating access minutes.

*Id.* at 166; *see also* [R. 92-2, p. 6 (quoting Duo County tariff, Section 2.3.11(C))]. In other words, when the originating call details do not provide enough information to determine the call's jurisdiction, the carrier should use the projected interstate usage, or PIU method, to determine

whether calls were interstate or intrastate. The PIU method creates an estimate as to the "general geographic location where a wireless call is made." [R. 92-2, p. 5].

The NECA tariff provided similar language:

> For Switched Access Service, the Telephone Company cannot in all cases determine the jurisdictional nature of customer traffic and its related access minutes. In such cases the customer may be called upon to provide a projected estimate of its traffic, split between the interstate and intrastate jurisdictions. For purposes of determining the jurisdiction of Switched Access Services, the regulations set forth in (1) through (4), below, apply.

[R. 100-1, p. 13]. Sections (1) through (4), in turn, describe the PIU method and its application.

*Id.* at 14–25. Of note, these sections explain,

> When the Telephone Company receives sufficient call detail to permit it to determine the jurisdiction of some or all originating and terminating access minutes of use, the Telephone Company will use that call detail to render bills for those minutes of use and will not use PIU factors(s) described in (2), below, to determine the jurisdiction of those minutes of use.

> When the Telephone Company receives insufficient call detail to determine the jurisdiction of some or all originating and terminating access minutes of use, the Telephone Company will apply the PIU factor(s) provided by the customer or developed by the Telephone Company as set forth in (2), below, only to those minutes of use for which the Telephone Company does not have sufficient call detail.

*Id.* at 15. Thus, both tariffs direct telephone companies to use the PIU method in the event that a call provides insufficient detail to determine that call's jurisdictional nature.

In the present case, Brandenburg would determine the jurisdictional nature of its calls by examining the area codes of the calling party number ("CPN") and the receiving number. *Brandenburg II*, 2019 WL 4565546, at *2. This is known as the CPN method. *Id.* Under this method, if both the calling party and the receiving party had Kentucky area codes, then the call was considered intrastate, and the higher access charges under the Duo County tariff were applied. However, with the advent of cell phones, a party could have a Kentucky area code but

be physically calling from out-of-state to a recipient in Kentucky, and instead of identifying the call as *interstate* (and charging the cheaper access fee), Brandenburg would categorize the call as *intrastate* and bill Sprint the higher rate under the Duo County tariff. *Id.* at *2.

In 2007, Sprint asked Brandenburg to stop using the CPN method to categorize calls as interstate or intrastate, and requested that Brandenburg use the PIU method instead. *Id.* at *3. While Sprint admitted that the PIU method "was not always accurate," it insisted that the "margin of error was significantly less than using the CPN method." *Id.* at *3. Brandenburg insisted that the CPN method was appropriate and complied with the tariffs' requirements on how to determine interstate and intrastate calls. *Id.* In other words, it seems Brandenburg felt that the call details provided sufficient information to determine the jurisdictional nature of the calls, and as a result, it did not need to resort to the PIU method. *See* [R. 9-2, p. 5]. Thus, based on its understanding of the tariff language, Brandenburg declined Sprint's request to switch to the PIU method. *Brandenburg II*, 2019 WL 4565546, at *3.  In response, Sprint began withholding payments to Brandenburg, beginning in approximately November 2007.[3] *Id.*  On March 28, 2008, Brandenburg threatened to terminate Sprint's access unless it paid the past due bills, but ultimately never did. *Id.*

### C.  The 2008 Administrative Complaint and Brandenburg's Emergency Motion

In April 2008, Sprint filed an administrative complaint with the Kentucky PSC, alleging that Brandenburg had misapplied the tariffs and wrongfully billed interstate calls at the higher intrastate rate. *See id.*; [R. 9-3 (Administrative Complaint)]. Sprint argued that Brandenburg, by

---

[3] It is unclear from the record when exactly Sprint started withholding payments. Brandenburg alleges that Sprint began withholding payments in November 2007, [R. 92, p. 9], but the Court of Appeals noted in *Brandenburg II* that withholding began in February 2008. *See Brandenburg II*, 2019 WL 4565546, at *3. In its Amended Counterclaims, Sprint claims that it paid its invoices from January 1, 2002 through October 2007, [R. 97, ¶ 90], which in turn suggests that it did *not* pay its invoices beginning in November 2007.

using the CPN method, violated several Kentucky statutes as well as certain provisions of the federal Communications Act "by inappropriately and unlawfully charging Sprint intrastate access rate for terminating jurisdictionally interstate traffic from wireless phones." [R. 9-3, pp. 3–4]. Sprint therefore asked the PSC to order Brandenburg to use the PIU method to calculate Sprint's charges and refund Sprint for any amounts improperly billed under the CPN method. *Id.* at 8–9. Specifically, Sprint sought refunds for amounts improperly billed between March 1, 2006 and April 10, 2008. *See, e.g.*, *Brandenburg II*, 2019 WL 4565546, at *3; [R. 9-3, p. 9 (Administrative Complaint)]. Brandenburg filed a counterclaim, seeking the money Sprint had been withholding during the ongoing fee dispute. [R. 9-4 (Answer and Counterclaim)]; *see also Brandenburg II*, 2019 WL 4565546, at *3.

On February 2, 2009, Brandenburg filed an Emergency Motion to Compel Payment, asking the PSC to order Sprint to pay "all outstanding and undisputed access charges." [R. 9-8, p. 1]. Sprint responded, insisting that its withholding of payments was merely the process by which it recouped the money it had previously overpaid to Brandenburg. [R. 9-9]. On this point, Sprint noted that "[o]nce the [Administrative] Complaint became necessary," it "continued to investigate its historic information and made additional adjustments going back to the beginning of 2002." *Id.* at 3. The record suggests that Brandenburg's Emergency Motion to Compel Payment, [R. 9-8], was denied. As noted below, Sprint later amended its initial complaint to expand the period of alleged overbilling to January 1, 2002 through June 2009. *See, e.g.*, *Brandenburg II*, 2019 WL 4565546, at *3; [R. 101-5 (Amendment to Administrative Complaint)].

**D.  This Lawsuit and Imposition of a Stay by This Court in 2009**

- 8 -

On or about February 3, 2009, shortly after filing its Emergency Motion with the PSC, Brandenburg sued Sprint in Meade Circuit Court, asserting a "collection action" to recover the money Brandenburg alleged it was owed by Sprint. [R. 1-3 (State Court Complaint)].[4] Specifically, Brandenburg asserted claims for breach of contract and unjust enrichment. *Id.* Sprint then removed that case to this Court. [R. 1]. In March 2009, Sprint filed a Motion to Dismiss or, alternatively, a Motion to Stay the case until the PSC's proceedings were complete. [R. 9]. Specifically, Sprint sought dismissal of the entire complaint, arguing that the PSC had "primary jurisdiction" and authority to resolve the parties' dispute. [R. 9-2, pp. 5–7, 11–15].[5] Sprint also sought dismissal under Federal Rule of Civil Procedure Rule 12(b)(1) for failure to exhaust administrative remedies and/or dismissal of Brandenburg's Count II (unjust enrichment) under Rule 12(b)(6). *Id.* In response, Brandenburg moved for summary judgment on both of its claims (breach of contract and unjust enrichment). [R. 17].

After Sprint filed its Motion to Dismiss, in which it argued that the parties' dispute could and should be resolved before the PSC, [R. 9-2], but before this Court ruled on the motion, Sprint amended its Administrative Complaint. [R. 101-5]. Specifically, Sprint requested refunds for bills dating back to 2002 (seven years before the PSC proceeding was initiated), rather than 2006 (two years before the PSC proceeding was initiated). *Id.* Shortly thereafter, Brandenburg moved to strike that amendment, arguing that a two-year statute of limitations applied under the federal Communications Act. *See* [R. 101, p. 14; R. 101-12]. Sprint responded, insisting that its

---

[4] In reviewing the record, the Court has noticed certain discrepancies between the Record Entry Number ("R.") reflected on the docket sheet and the Record Entry Number reflected on the filing. For example, the electronic docket does not reflect an entry at R. 1-3, but the state court complaint itself is clearly marked as R. 1-3. To be clear, the Court references the Record Entry Number *listed on the document*.

[5] Record Entry Number 9 has several attachments, which have been listed on the electronic docket as R. 9-1 through R. 9-10. However, the documents are marked with different Record Entry Numbers than those reflected on the electronic docket. For example, the electronic docket identifies Sprint's memorandum as R. 9-1; however, the document is actually labeled R. 9-2. Again, the Court references the Record Entry Number *listed on the document*.

claims arose under state law. [R. 101-12]. The PSC apparently resolved this motion in favor of Sprint, as Sprint was allowed to amend its Administrative Complaint. *See* [R. 101-5].

Later, on September 28, 2009, this Court denied in part and granted in part Sprint's Motion to Dismiss. [R. 25]. The Court denied Sprint's motion to dismiss the case for lack of subject matter jurisdiction, finding that "[t]he current action is not one within the exclusive jurisdiction of the PSC" because Brandenburg presents a damages claim, which the PSC does not have jurisdiction to resolve. *Id.* at 3–5. This Court also denied Sprint's motion to the extent it argued failure to exhaust administrative remedies. *Id.* at 8. The Court determined that because the PSC did not have jurisdiction over the damages action, the administrative exhaustion doctrine was inapplicable. *Id.* at 7–8. However, the Court granted Sprint's request for a stay, finding that "a stay is appropriate" because "a resolution of the issues currently pending before the PSC will both simplify the proceedings, as well as aid the Court in its final determination." *Id.* at 9. Lastly, because the Court granted a stay, it declined to address Sprint's argument that dismissal of Brandenburg's Count II (unjust enrichment) was warranted pursuant to Rule 12(b)(6). *Id.* at 10. It also declined to address Brandenburg's summary judgment motion.

### E.  The PSC's November 6, 2009 Final Decision

Following discovery and a final hearing, the PSC issued a final decision in favor of Sprint on November 6, 2009. [R. 92-2 (PSC Final Decision)]. The PSC found that "Brandenburg's reliance on only the CPN to assign the jurisdiction of a wireless call unreasonably allocates substantial amounts of interstate traffic to the intrastate jurisdiction, resulting in the application of access charges that are not in compliance with [the Duo County tariff]." *Id.* at 10. The PSC further stated that "the parties should apply the PIU to calls delivered to Brandenburg via Sprint's IXC network pursuant to . . . the Duo County tariff." *Id.* The PSC therefore ordered that

"Sprint's methodology for determining the PIU should be applied for calculating compensation" and further ordered "[t]he parties to reach an agreement on the amount of compensation." *Id.* at 11. On January 4, 2010, Brandenburg sought judicial review of the PSC's order in Franklin Circuit Court. *See* [R. 92-3 (Nov. 28, 2012 Franklin Cir. Ct. Op.)].

### F.  This Lawsuit and Additional Stay Imposed by This Court in 2010

On December 16, 2009, shortly before Brandenburg sought review of the PSC order, Sprint filed an Answer and Counterclaims in this Court. [R. 28]. Through its affirmative defenses, Sprint argued that Brandenburg's breach of contract claim was "barred by the PSC's determinations," res judicata, and collateral estoppel. *Id.* at 3. Sprint also argued that Brandenburg's claim was "barred by Brandenburg's violation of its intrastate and interstate switched access tariffs" and "because it would be illegal for Brandenburg to collect more than its tariffed rates for switched access services." *Id.* Through its counterclaims, Sprint sought enforcement of the PSC's order (Count I); enforcement of the Duo County tariff's refund provisions[6] (Count II); and damages for violation of the filed rate doctrine[7] (Count III). *Id.* at 7–9. Specifically, Sprint sought damages in the amount of its calculated "refund" due to the alleged overpayments to Brandenburg. *Id.* at 9.

On January 8, 2010, Brandenburg filed a Motion to Dismiss or, in the Alternative, to Stay Defendant/Counter-Plaintiff Sprint's Counterclaims, [R. 34]. In this motion, Brandenburg sought

---

[6] Sprint cites to Section 2.4.1(E) of the Duo County Tariff, which provides, "If the customer pays the total billed amount and disputes all or part of the amount, the Telephone Company will refund any overpayment. In addition, the Telephone Company will pay the customer penalty interest on the overpayment." [R. 28, p. 7].

[7] The filed rate doctrine, sometimes referred to as the filed tariff doctrine, "requires that common carriers and their customers adhere to tariffs filed and approved by the appropriate regulatory agencies." *MCI Telecommunications Corp. v. Ohio Bell Telephone Co.*, 376 F.3d 539, 547 (6th Cir. 2004). In other words, carriers are forbidden "from charging or collecting different compensation than specified in an effective tariff." *Cincinnati Bell Telephone Co. v. Allnet Communications Services, Inc.*, 17 F.3d 921, 924 n.4 (6th Cir. 1994) (quoting *In the Matter of MCI Telecommunications Corp.*, 62 F.C.C.2d 703, 706 (1976)) (internal quotation marks omitted).

to dismiss Sprint's counterclaims in full because (1) Sprint's counterclaims were not yet ripe due to the appeal, and the Court therefore lacked subject matter jurisdiction; (2) the Franklin Circuit Court possessed exclusive appellate jurisdiction over any PSC orders; (3) only the PSC could enforce its orders, and Sprint therefore lacked standing; and (4) Sprint failed to join an indispensable party, namely, the PSC. *Id.* at 7–16. Brandenburg also asked the Court to dismiss Counterclaims II and III (for a refund and damages) because Sprint failed to exhaust its administrative remedies by failing to raise those claims with the PSC, or, if they were raised, because res judicata applied. [R. 44, pp. 7–9]. In the alternative, Brandenburg asked that the federal court proceedings be stayed pending judicial review of the PSC order in state court. [R. 34, pp. 17–21].

Before turning to this motion, however, the Court considered those motions that had been pending at the time the stay was originally imposed in September 2009, including Brandenburg's pre-stay Motion for Summary Judgment, [R. 17], and those portions of Sprint's pre-stay Motion to Dismiss, [R. 9], that the Court had previously declined to address. On March 5, 2010, this Court denied Brandenburg's Motion for Summary Judgment, [R. 17], because Brandenburg had not presented enough evidence as to damages with respect to its breach of contract claim. [R. 50, pp. 6–7]. In addition, the Court dismissed Brandenburg's claim for unjust enrichment (Count II of the Complaint), as requested by Sprint in its pre-stay Motion to Dismiss, [R. 9, pp. 16–18]. *See* [R. 50, p. 4].

The Court then turned to Brandenburg's motion to dismiss Sprint's counterclaims and alternative request to stay the proceedings. [R. 34]. On April 1, 2010, this Court denied the motion in part and granted it in part. After addressing each of Brandenburg's arguments, the Court denied the motion to the extent it sought dismissal of any of Sprint's counterclaims.

- 12 -

[R. 54, pp. 4–13]. Ultimately, however, the Court granted Brandenburg's request for a stay and stayed "all the claims," explaining that the parties' claims would be impacted if the PSC's order was reversed on appeal in state court. *Id.* at 22.

### G.  The November 2012 Franklin Circuit Court Order and Appeal Thereof

On November 28, 2012, the Franklin Circuit Court entered its order reversing the PSC's decision. [R. 92-3]. The court held that

> the PSC's decision was arbitrary, specifically faulting the PSC for failing to provide adequate "reasoning for its decision consistent with the plain meaning of the tariffs"; the accuracy of the methodology used to jurisdictionalize calls was not a factor required by the tariff; the PIU could only be applied when a call lacked sufficient call detail, specifically the calling party number [i.e., 1-800 numbers]; the ruling was inconsistent with prior interpretations of the tariff and prevailing understandings of its proper application; and, that while the PSC has authority to prospectively adopt new standards or regulations to address new concerns or factual situations—such as advances in technology—the PSC had, in this case, engaged in retroactive rulemaking, a practice condemned in KRS 446.080(3).[8]

*Public Service Comm'n of Kentucky v. Brandenburg Telephone Co.*, Nos. 2013-CA-001625-MR, 2013-CA-001630-MR, 2015 WL 1880787, at *3 (Ky. App. Apr. 24, 2015) (hereafter "*Brandenburg I*") (summarizing trial court's holdings); *see also* [R. 92-3, pp. 4–7]. The Franklin Circuit Court therefore found that Sprint was not entitled to the relief it sought, and it reversed the PSC's order. [R. 92-3, pp. 7–8].

On December 10, 2012, Sprint and the PSC filed Motions to Alter, Amend, or Vacate the Franklin Circuit Court's November 28, 2012 Order. *See, e.g.*, [R. 101-6 (Sprint's Motion to Alter, Amend, or Vacate)]. Sprint made the following arguments: (1) the trial court utilized the wrong standard of review and failed to give proper deference to the PSC's ruling; (2) the trial

---

[8]  KRS § 446.080(3) provides, "No statute shall be construed to be retroactive, unless expressly so declared." Kentucky's courts have explained that the retroactive application of regulations violates this statute. *See Brandenburg I*, 2015 WL 1880787, at *5 (citing *Kerr v. Ky. State Bd. of Registration for Professional Engineers and Land Surveyors*, 797 S.W.2d 714, 717 (Ky. App. 1990)).

court erroneously, and without evidentiary support, found the PSC's decision to conflict with prior rulings when the issue presented for review was, in fact, a matter of first impression; (3) the trial court erred in concluding the tariff was ambiguous and compounded the error by resolving the ambiguity in favor of Brandenburg; and (4) the trial court's ruling was in violation of federal law as it permitted the application of a state tariff to interstate communications. *Id.*; *see also Brandenburg I*, 2015 WL 1880787, at *4.

On August 20, 2013, after a hearing on the matter, the trial court addressed both motions and entered an order granting those motions in part and denying them in part. *See Brandenburg Tel. Co. v. Pub. Serv. Comm'n of Kentucky*, No. 10-CI-00019 (Franklin Cir. Ct. Aug. 20, 2013). Specifically, the Franklin Circuit Court reiterated and clarified its earlier holdings that the PSC's decision was arbitrary and unreasonable and that the PSC "may not retroactively apply interpretations of first impression to rules, regulations and practices without proper notice to Brandenburg Telephone Company." *Id.* at 5. Thus, the Franklin Circuit Court reemphasized its conclusion that the PSC may only apply its new interpretation prospectively, not retroactively. *Id.* Notably, the trial court did not address Sprint's argument that its ruling violated federal law.

Both Sprint and the PSC appealed the Franklin Circuit Court's decision to the Court of Appeals of Kentucky. *See Brandenburg I*, 2015 WL 1880787, at *4; [R. 101-7 (Sprint's 2013 Appellate Brief)]. Among other things, Sprint argued that the Franklin Circuit Court failed to consider the filed rate doctrine, and both state and federal law prohibited Brandenburg from using the CPN method to determine jurisdiction. [R. 101-7, pp. 20–21, 28–30]. However, the appellate court reversed and remanded the matter on other grounds, all related to perceived ambiguities in the lower court's decision reversing the PSC.[9] *See Brandenburg I*, 2015 WL

---

[9] Specifically, the Kentucky Court of Appeals remanded the case for further proceedings on the following three issues: (1) clarify and apply the appropriate standard of care; (2) reconcile the PSC's prospective application of its

1880787, at *7–9. Like the trial court, the appellate court did not address Sprint's argument that the trial court ruling violated the filed rate doctrine or federal law.

Sprint and the PSC separately sought discretionary review from the Supreme Court of Kentucky, and both motions were denied in a single order. *See* [R. 101–9 (Sprint's Mot. for Discretionary Review)]. The matter was therefore remanded to the Franklin Circuit Court for further review.

### H.  The March 2017 Franklin Circuit Court Order and Appeal Thereof

On remand, the Circuit Court clarified and reiterated its earlier decision. [R. 92-4]. The trial court confirmed both its finding that the PSC "deviated from the plain meaning of the tariff" and its stance "that retroactive application of administrative regulations is prohibited by KRS 446.080(3)." *Id.* at 6–7. Consequently, the Circuit Court restated its conclusion that while updating "the applicable tariffs to modern communications standards" is within the PSC's discretion and "rulemaking power," the PSC may not retroactively impose the new standards on Brandenburg, who acted in "good faith under the prevailing interpretation of the [disputed] tariffs." *Id.* at 8–9. In other words, while Sprint was barred from recovering payments collected in good faith by Brandenburg under the prior interpretation of the Duo County tariff (which approved the use of the CPN method to determine jurisdiction), Sprint was entitled to *prospective* relief under the new interpretation (which required the use of the PIU method to determine the jurisdiction), beginning on November 6, 2009, the date of the PSC's final order. *Id.* at 8.

Following this decision on remand, Sprint appealed again, arguing among other things that "the PSC's interpretation of the [Duo County tariff] provides the only result consistent with

---

interpretation; and (3) reconcile any implication that the court's earlier opinions placed an affirmative duty on the PSC to update tariffs to accommodate the demands of modern communications. [R. 92-4, p. 6].

federal law." [R. 101-10, p. 19 (Sprint's 2017 Appellate Brief)]. Thus, Sprint argued, if the appellate court affirmed the lower court, "it will be interpreting the [Duo County tariff] so as to contradict federal law." *Id.* at 13. Nevertheless, the Kentucky Court of Appeals affirmed the Franklin Circuit Court. *See Brandenburg II*, 2019 WL 4565546, at *5. The appellate court found that the PSC's order amounted to a "rate adjustment," and the PSC only had the statutory power to adjust rates prospectively. *Id.* at *5. Thus, the PSC's attempted retroactive adjustment of the tariff was "unlawful because it exceeds the PSC's legislative authority for rate making and rate adjustment." *Id.* The Court of Appeals therefore affirmed the Circuit Court's March 1, 2017 order "reversing the PSC's November 6, 2009 administrative order adjusting the Brandenburg tariff rate to the extent it applies prior to that date." *Id.* In doing so, the appellate court did not address Sprint's arguments concerning potential conflicts with federal law.

On April 22, 2020, the Supreme Court of Kentucky denied Sprint and the PSC's requests for discretionary review, and the parties thereafter notified this Court that the state court litigation had concluded. [R. 87].

## I. The Pending Motions in This Court

As a result of the state litigation's end, this Court lifted its stay on June 3, 2020. [R. 88]. The parties thereafter consented to Brandenburg filing an Amended Complaint and Sprint filing Amended Counterclaims. [R. 90; R. 91]. In its Amended Complaint, Brandenburg claims breach of contract/tariff for "Sprint's refusal to pay Brandenburg Telephone for the switched access services billed for the period from November 2007 to February 2011." [R. 92, p. 9]. Brandenburg seeks "[a] judgment against Sprint for all damages incurred . . . as a result of Sprint's refusal to pay for the switched access charges billed to Sprint from November 2007 to February 2011." *Id.* at 10.

In response, Sprint asserts various affirmative defenses, including federal preemption. [R. 97, pp. 8–9]. Specifically, Sprint argues that "[e]nforcement of the Duo [County] Tariff to collect state rates on interstate communications is preempted by federal law," and "[p]ursuant to the filed rate doctrine and the Supremacy Clause . . . , the federal NECA Tariff and federal law must prevail over conflicting state tariffs and laws." *Id.* at 9. Sprint also asserts five counterclaims: a claim for declaratory relief that the doctrine of federal preemption prohibits application of the state court rulings (Count I); a claim for declaratory relief that conflict preemption applies and as a result, the federal tariff controls (Count II); a claim for declaratory relief that, under the Commerce Clause, the federal tariff controls (Count III); a claim for enforcement of the refund provision of the state tariff (Count IV); and a claim for penalty interest under the filed rate doctrine (Count V). *See* [R. 97, pp. 21–25].

Both parties now move for summary judgment. Brandenburg argues that Sprint's liability was established in the state court proceedings, and the doctrines of collateral estoppel and judicial estoppel prevent Sprint from now claiming otherwise based on federal law. [R. 101, pp. 7–17]. Brandenburg also argues that this Court lacks subject matter jurisdiction over Sprint's counterclaims; Sprint's request for a refund is barred by the doctrine of res judicata; and regardless, federal preemption is inapplicable. *Id.* at 17–22. Lastly, Brandenburg argues that Sprint's own admissions prove the amount of damages owed to Brandenburg. *Id.* at 23–25. Relying on these arguments, Brandenburg seeks summary judgment on its remaining claim (breach of contract/tariff) and on all of Sprint's counterclaims. *Id.* at 25.

In its Motion for Summary Judgment, Sprint moves for partial summary judgment on three of its five counterclaims and on one portion of its federal preemption affirmative defense. [R. 102, p. 1]. More specifically, Sprint seeks summary judgment on Counts I, II, and III of its

counterclaims—those concerning federal preemption, conflict preemption, and the Commerce Clause (hereafter, the "preemption counterclaims"). *Id.* With respect to these counterclaims, Sprint requests a declaration that the Duo County tariff "cannot be enforced to require Sprint to pay state rates" for the calls arising between January 2002 and November 6, 2009 that would have been designated as interstate had Brandenburg applied the PIU method. *Id.* at 1–2.

Sprint next seeks summary judgment on its affirmative defense of federal preemption, to the extent it concerns bills issued by Brandenburg between November 6, 2009 and June 2010. *Id.* at 1. Sprint claims that, during this time period, Brandenburg refused to use the PIU method to classify calls as interstate or intrastate, despite the PSC's ruling. *Id.* at 2. By continuing to use the CPN method through June 2010, Sprint claims, Brandenburg overbilled Sprint by $381,945. *Id.* To the extent Brandenburg seeks to recover this amount from Sprint, Sprint argues it "is entitled to judgment that Brandenburg's request fails." *Id.*[10]

In addition to seeking summary judgment, Sprint has also filed a Motion for Judicial Notice. [R. 100]. In that motion, Sprint ask the Court to "take judicial notice of representative portions of telecommunications tariffs effective during the time periods covered by Sprint's pending counterclaims." *Id.* at 1. The "representative portion" includes just under 300 pages consisting of excerpts from the state and federal tariffs. [R. 100-1].

These motions are fully briefed and ripe for review. *See* [R. 103; R. 104; R. 105; R. 106; R. 107; R. 108].

## II.   STANDARD OF REVIEW

Sprint removed the case to this Court on the basis of diversity jurisdiction under 28 U.S.C. § 1332. [R. 1]. As a result, this Court applies the substantive law of the forum state,

---

[10] It appears this issue has been resolved. *See* infra Section III(B)(7).

Kentucky. *See Rawe v. Liberty Mut. Fire. Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (citation omitted). However, federal procedural law will govern as applicable, including in establishing the appropriate summary judgment standard. *See Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 408 (6th Cir. 2006) (citation omitted).

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

### A.  Motion for Judicial Notice

Before turning to the parties' motions for summary judgment, the Court will address Sprint's Motion for Judicial Notice. [R. 100]. In that motion, Sprint asks the Court "to take judicial notice of representative portions of telecommunications tariffs effective during the time periods covered by Sprint's pending counterclaims" under Federal Rule of Evidence 201. *Id.* at 1. More specifically, Sprint asks the Court to take judicial notice of portions of the NECA tariff and Duo County tariff in effect "as of November 1, 2009." *Id.* at 2. Brandenburg objects, arguing that most of the pages provided by Sprint are irrelevant because "the only issue properly before this Court is the amount of money damages to which Brandenburg is entitled." [R. 103, p. 1]. The only page that would be relevant to this case, Brandenburg argues, is a single page of the Duo County tariff dealing with late payment penalty interest. *Id.* Brandenburg therefore asks the Court to grant Sprint's motion to the extent it seeks to introduce that page—specifically, page 2-31 of the Duo County tariff—but deny it in all other respects. *Id.* at 2, 4.

Under Rule 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it" is either "generally known within the trial court's jurisdiction" or it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). However, "[a] fact is not the proper subject of judicial notice

if the notice is sought for a purpose that is 'not relevant or necessary to resolve [the] action.'"

*Jones v. Prudential Security, Inc.*, 534 F.Supp.3d 839, 841 (E.D. Mich. 2021) (quoting *Cece v. Wayne County*, 758 F. App'x 418, 425 (6th Cir. 2018)). Ultimately, if a party requests judicial notice "and the court is supplied with the necessary information," then it "must take judicial notice." Fed. R. Evid. 201(c)(2).

In this case, neither party disputes that the Court may take judicial notice of tariffs under Rule 201.[11] *See Marcus v. AT&T Corp.*, 938 F.Supp. 1158, 1164–65 (S.D. N.Y. 1996) (finding that the court may take judicial notice of the tariffs at issue because they are public documents filed on record with the FCC (citations omitted)); *Kutner v. Sprint Communications Co. L.P.*, 971 F.Supp. 302, 304 n.1 (W.D. Tenn. 1997) (noting that the court took judicial notice of the tariffs at issue in that case). Moreover, neither party disputes the accuracy of those portions of the tariffs cited by Sprint or the reliability of the sources supplying those excerpts.[12] Instead, the parties dispute the relevance of the excerpts. If the only issue before the Court were damages, as Brandenburg suggests, then the Court might be inclined to agree that much of the cited tariff excerpts are irrelevant. However, as Sprint has stated, it "defends this action on the basis that mandatory terms of the federal NECA Tariff defeat Brandenburg's requested recovery." [R. 104, p. 3]. In other words, Sprint raises defenses and counterclaims that go beyond Brandenburg's request for damages, and which require the Court to review "the applicable tariff language." *Id.*;

---

[11] In fact, while Brandenburg does not expressly ask that this Court take judicial notice of the tariffs, it cites to portions of the Duo County tariff in its Motion for Summary Judgment and notes that "the Court may take judicial notice of the relevant provisions." [R. 101, p. 24 (citations omitted)].

[12] As Sprint explains in its motion, the federal tariff, including present and past versions, is available on the FCC website. [R. 100, p. 1; R. 100-1, ¶¶ 5, 8]. Prior versions of the state tariff are available through a subscription service that allows telecommunications companies to obtain copies of the tariff. [R. 100, p. 2; R. 100-1, ¶¶ 10–11]. To obtain and verify the tariffs, Sprint retained the services of a Regulatory Policy Manager at T-Mobile, who had previously worked in that capacity for Sprint. [R. 100-1].

*see generally Global Crossing*, 2006 WL 8458971, at *3 ("In order to determine whether the Defendant is charging a rate other than that permitted by the tariff, it is necessary to look at the language of the tariff . . . ."). The Court therefore finds it appropriate to take judicial notice of the Duo County tariff and the NECA tariff. The Court will therefore grant Sprint's Motion for Judicial Notice, [R. 100].[13]

### B.  Motions for Summary Judgment

As previously noted, Brandenburg moves for summary judgment on its remaining claim for breach of contract and all five of Sprint's counterclaims, stating that "Sprint's liability has been established in the [state proceedings], and there are no remaining federal issues, including preemption that remain to be determined." [R. 101, p. 7]. Sprint, on the other hand, seeks summary judgment on its three preemption counterclaims (Counts I–III). With respect to these preemption counterclaims, Brandenburg argues that the Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine and regardless, Sprint's federal preemption arguments are barred by collateral estoppel, res judicata, judicial estoppel, and/or the statute of limitations.

Clearly, the parties' arguments are intertwined. The Court cannot consider Brandenburg's breach of contract claim (which essentially asks this Court to give preclusive effect to the state court rulings) without first considering Sprint's preemption arguments (which essentially asks this Court to hold that the state court rulings cannot be enforced).  Accordingly, the Court will consider what preclusive effect, if any, should be given to the state court rulings before turning to Sprint's claims of federal preemption. As an initial matter, however, the Court will first consider whether it has subject matter jurisdiction to decide Sprint's preemption arguments.

---

[13] In doing so, the Court does not address the parties' unnecessary dispute over whether a motion for judicial notice was the proper vehicle to raise this issue, or whether the request should have been raised in the parties' motions for summary judgment. *See, e.g.*, [R. 104, pp. 4–5].

### 1.   Subject Matter Jurisdiction Under the *Rooker-Feldman* Doctrine

Like all federal district courts, this Court's jurisdiction "is confined within such limits as Congress sees fit to prescribe." *RLR Investments, LLC v. City of Pigeon Forge, Tennessee*, 4 F.4th 380, 385 (6th Cir. 2021) (quoting *The Francis Wright*, 105 U.S. 381, 385 (1881)) (internal quotation marks omitted). Congress included one such limitation within 28 U.S.C. § 1257, which states that "[f]inal judgments or decrees rendered by the highest court of a State . . . may be reviewed by the Supreme Court." *Id.* The Supreme Court has explained "that this grant of jurisdiction is exclusive: 'Review of such judgments may be had *only* in this Court.'" *Lance v. Dennis*, 546 U.S. 459, 463 (2006) (quoting *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983)). Logically, "[i]f the Supreme Court can review 'final judgments' from state courts of last resort, then lower federal courts can't." *RLR Investments*, 4 F.4th at 385 (citing *Kovacic v. Cuyahoga Cnty. Dep't of Child. and Fam. Servs.*, 606 F.3d 301, 309 (6th Cir. 2010)). This "negative inference" is known as the *Rooker-Feldman* doctrine.[14] *Id.*

Under this doctrine, "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance*, 546 U.S. at 463. In other words, it prevents "'a de facto appeal from a state court judgement' in federal court." *RLR Investments*, 4 F.4th at 386 (quoting *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004)). For many years, this general principle was expanded by lower courts, which often struggled with determining "what constitutes a forbidden de facto appeal." *Id.* (quoting *Kougasian*, 359 F.3d at 1139) (internal quotation marks omitted). More recently, however, the Supreme Court has clarified the narrow scope of the *Rooker-Feldman* doctrine. *Lance*, 546 U.S. at 464–66; *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 291–93 (2005). Importantly, the Supreme Court has

---

[14] The doctrine derives its name from two decisions, both from the Supreme Court: *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

confined the doctrine to "[1] cases brought by state-court losers [2] complaining of injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284.

The Supreme Court has also addressed certain scenarios in which the doctrine does *not* apply. It has explained that, "[w]hen there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court." *Id.* at 292. True, when such parallel proceedings exist, "[c]omity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation." *Id.* (citations omitted). But the *Rooker-Feldman* doctrine does not "support[] the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court." *Exxon*, 544 U.S. at 292. Instead, under those circumstances, "[d]isposition of the federal case . . . would be governed by preclusion law." *Id.* at 293; *see also Lance*, 546 U.S. at 466 (explaining that the *Rooker-Feldman* doctrine "is not simply preclusion by another name").

The Court finds that the *Rooker-Feldman* doctrine is inapplicable in this case. This is not one of the limited cases in which a "state-court loser[] complain[s] of injuries caused by state-court judgments *rendered before the district court proceedings commenced* and invit[es] district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284 (emphasis added). Instead, these federal proceedings commenced in February 2009,[15] and the Court's diversity jurisdiction was invoked. *See* [R. 1]. At that time, the state PSC proceedings were ongoing, but no final judgment had been rendered—indeed, the PSC had yet to even enter its order that

---

[15] Whether the date of commencement is February 3, 2009 (the date the action was filed and a summons issued in state court, *see* Kentucky Civil Rule "CR" 3.01) or February 25, 2009 (the date of the removal to this Court), the end result is the same: this matter commenced long before the state courts entered their final orders.

prompted the state appeal process. Thus, this case involves concurrent jurisdiction—that is, this lawsuit was properly removed to this Court on the basis of diversity jurisdiction *before* the state court rendered a final judgment. The Court's subject matter jurisdiction was not destroyed merely because the state court issued a final judgment in those parallel proceedings. *Exxon*, 544 U.S. at 293.

Brandenburg does not dispute that this federal suit was filed prior to the state court's final decision and that this Court had subject matter jurisdiction at that time. However, Brandenburg argues that *Rooker-Feldman* nonetheless applies because Brandenburg's Amended Complaint and Sprint's Amended Counterclaims were filed *after* the entry of the state court judgment. [R. 107, p. 10]. Those Amended Counterclaims add new claims not previously included in Sprint's initial counterclaims, and such claims (i.e., federal preemption) attack the state court judgment. *See id.*; [R. 28 (Original Counterclaims); R. 97 (Amended Counterclaims)]. Under these circumstances, Brandenburg argues, the amended pleadings are the operative pleadings under *Rooker-Feldman*. [R. 107, p. 10].

While the Court is sympathetic to this argument, Brandenburg does not cite any case law to support this assertion, and other federal courts have suggested that *Rooker-Feldman* does not apply under these circumstances. For example, in *McCloud v. Mairs*, No. 12CV2556(SLT)(LB), 2014 WL 9880043 (E.D. N.Y. 2014), the defendants made a similar argument, relying on the date of the amended complaint to argue that *Rooker-Feldman* applied. *Id.* at *4. However, that court explained, the amended complaint did not add a new claim attacking the state court judgment and regardless, the filing of an amended complaint that does not add a new defendant[16] does not change the date on which the suit commenced. *Id.* (citations omitted). Instead, under

---

[16] The amended pleadings in this case did *not* add new defendants.

Federal Rule of Civil Procedure 3, the suit commences on the date the *complaint* is filed. *See id.*;
Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). The court
in *McCloud* concluded that "[t]here is no reason to apply a different rule for purposes of the
*Rooker-Feldman* doctrine, particularly given the Supreme Court's admonition that the doctrine
should be narrowly applied." *McCloud*, 2014 WL 9880043, at \*4 (citing *Exxon Mobil Corp.*, 544
U.S. at 293). As a result, the plaintiff's amended complaint "did not destroy subject matter
jurisdiction that existed since the time [the] plaintiff initiated this action." *Id.* (citations omitted).

Other courts have ruled similarly. *See Lozman v. City of Riviera Beach, Fla.*, 713 F.3d
1066, 1072 n.3 (11th Cir. 2013) ("[I]f a federal court has properly invoked subject matter
jurisdiction at the time of the initial federal complaint, the *Rooker-Feldman* doctrine cannot
spring into action and eliminate jurisdiction merely because an amended complaint is filed.");
*United States v. Ward*, No. JKB-21-3165, 2023 WL 121866, at \*4 (D. Md. Jan. 6, 2023)
(declining to apply *Rooker-Feldman* to allegations regarding a state court judgment that were
raised for the first time in an amended complaint, which was filed after the state court decision);
*Nahas v. Shore Medical Center*, No. 13-6537, 2016 WL 1029362, at \*5–6 (D.N.J. Mar. 15,
2016) (declining to adopt the date on which the first amended complaint was filed as the date the
action commenced). Interestingly, in *Nahas v. Shore Medical Center*, the District Court of New
Jersey considered whether the amended complaint's new claims (i.e., claims that did not relate
back to the initial complaint) "commenced" prior to the state court's final judgments. *See* 2016
WL 1029362, at \*6. To answer that question, the court looked to that district's rules concerning
statutes of limitations. *Id.* It found that, under its rules, an amended complaint's new claims
commence for statute of limitations purposes at the time a motion to amend (with attached
amended complaint) is filed. *Id.* (citations omitted). Because the motion to amend was filed prior

to the state court judgment, *Rooker-Feldman* did not bar the new causes of action, even though the motion was not granted until after the state court judgment issued. *Id.*

From this analysis, one could argue that the Court should consider when Sprint's new counterclaims "commenced" under this district's statute of limitations rules. The Court declines to do so, however. The *Nahas* opinion is an unpublished district court opinion from the District of New Jersey, in the Third Circuit. As such, it is non-binding on this Court, and furthermore, the Court finds its analysis to be unpersuasive. First, for the Court to find that the filing of an amended counterclaim triggers the *Rooker-Feldman* doctrine, even though the initial complaint was filed long before the state court judgment, the Court must first disregard the principle that "if a federal court has properly invoked subject matter jurisdiction at the time of the initial federal complaint, the *Rooker-Feldman* doctrine cannot spring into action and eliminate jurisdiction merely because an amended complaint is filed." *Lozman*, 713 F.3d at 1072 n.3; *see also Exxon*, 544 U.S. at 294. Furthermore, the Supreme Court has clearly stated that the state court judgment at issue must be "rendered before the *district court proceedings* commenced," *Exxon*, 544 U.S. at 294 (emphasis added)—not before the specific claim challenging the state court ruling is raised. Rule 3, in turn, makes clear that "[a] civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. In other words, the district court proceedings commence when the initial complaint is filed. This Court finds "no reason to apply a different rule for purposes of the *Rooker-Feldman* doctrine, particularly given the Supreme Court's admonition that the doctrine should be narrowly applied." *McNair*, 2014 WL 9880043, *4 (citing *Exxon*, 544 U.S. at 293). Accordingly, the Court declines to find that Sprint's Amended Counterclaims divested this Court of subject matter jurisdiction.[17] *See generally Ward*, 2023 WL 121866, at *4 (D. Md. Jan. 6,

---

[17] This analysis is supported by the *McNair* decision. In that case, the court first noted that, "[a]lthough plaintiff filed an amended complaint after the state court [judgment], the amendment did not include a new claim attacking the state

2023) (declining to apply *Rooker-Feldman* to allegations regarding a state court judgment that were raised for the first time in an amended complaint, which was filed *after* the state court rendered its decision).

In sum, the Court cannot apply the *Rooker-Feldman* doctrine in this case, given its narrow application and the lack of case law in which amended pleadings have triggered the doctrine. While Sprint amended its counterclaims after entry of the state court judgment to effectively challenge that state court decision, the Court is unaware of any case law that would support application of the *Rooker-Feldman* doctrine under such circumstances. Instead, the Court finds that these federal proceedings commenced prior to the state court judgment, and the Court's properly invoked subject matter jurisdiction was not destroyed by the filing of the amended pleadings.

The Court therefore finds that the narrow *Rooker-Feldman* doctrine does not apply. However, the Court must consider whether (and to what extent) the state court judgments should be given preclusive effect. *See Exxon*, 544 U.S. at 293 ("Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law."). Accordingly, the Court next turns to the relevant preclusion doctrines—namely, collateral estoppel and res judicata.

### 2.  Collateral Estoppel and Res Judicata

When a party asserts "[f]ederal claims that attempt to relitigate issues already heard in a state court (or reviewed by a state appellate court)," such claims are barred by preclusion

---

court's judgment." 2014 WL 9880043, at *4. From this, one could argue that the *McNair* court was at least suggesting that the filing of new causes of action could trigger the *Rooker-Feldman* doctrine. However, the *McNair* court goes on to state that "[m]oreover, in other contexts," the original complaint is the operative pleading for determining when a federal action commences, citing Rule 3. *Id.* This language suggests that, even if a new cause of action had been asserted in the amended complaint, the *McNair* court would still have found that the date of the original pleading was the date the action commenced.

doctrines—namely, collateral estoppel or res judicata—"via the Full Faith and Credit statute, 28 U.S.C. § 1738, which extends the principles embodied in the Full Faith and Credit Clause of the U.S. Constitution." *Hillman v. Shelby Cnty. Govt.*, 297 F. App'x 450, 451 (6th Cir. 2008). These full faith and credit principles "generally require 'that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *In re Bursack*, 65 F.3d 51, 53 (6th Cir. 1995) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). Accordingly, the Court looks to Kentucky's preclusion law to determine if the doctrines of collateral estoppel or res judicata apply in this case. *See id.* (citation omitted).

As the Supreme Court of Kentucky has explained, the terms "res judicata" and "collateral estoppel" are "sometimes used interchangeably" but are "technically different doctrines." *Miller v. Admin. Office of the Courts*, 361 S.W.3d 867, 871 (Ky. 2011). Res judicata, or claim preclusion, "prohibits the relitigation of claims that were litigated or could have been litigated between the same parties in a prior action." *Id.* On the other hand, collateral estoppel, or issue preclusion, "allows the use of an earlier judgment by one not a party to the original action to preclude relitigation of matters litigated in the earlier action." *Id.* With these basic differences established, the Court addresses each doctrine in more detail.

### a.      Collateral Estoppel

Collateral estoppel, or issue preclusion, "is a similar but necessarily distinct doctrine from" res judicata, or claim preclusion. *Id.* For this doctrine to apply,

> (1) at least one party to be bound in the second case must have been a party in the first case; (2) "the issue in the second case must be the same as the issue in the first case"; (3) "the issue must have been actually litigated"; (4) "the issue was actually decided in that action"; and (5) "the decision on the issue in the prior action must have been necessary to the court's judgment" and adverse to the party to be bound.

*Id.* (quoting *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998)). As noted by Brandenburg,[18] the doctrine requires a final decision on the merits of the issue in question. [R. 101, pp. 7–8 (quoting *Epps Chevrolet Co. v. Nissan North America, Inc.*, 99 F. Supp. 3d 692 (E.D. Ky. 2015))]; *see also Bartley v. Culbertson*, 365 S.W.3d 593, 596 (Ky. Ct. App. 2012) (explaining that the third element—that an issue be "actually decided"—requires a "final adjudication"); *Miller*, 361 S.W.3d at 874 (holding that issue preclusion did not apply where there was no final judgment on the merits of that issue).

Furthermore, for "issue preclusion [to] stick against a current defendant who lost earlier . . . [t]wo further elements must be met: [] the defendant must have had a 'realistically full and fair opportunity to litigate the issue,' and [] preclusion must be consistent with 'principles of justice and fairness.'" *In re Nageleisen*, 523 B.R. 522, 528 (Bankr. E.D. Ky. 2014) (quoting *Columbia Gas Transmissions, LLC v. Raven Co., Inc.*, No. 12-72-ART, 2014 WL 2711943, at *4 (E.D. Ky. June 12, 2014)) (internal quotation marks omitted); *see also Chesley v. Abbott*, 524 S.W.3d 471, 482 (Ky. Ct. App. 2017) (citations omitted).

### i.    Brandenburg's Breach of Contract Claim

---

[18] Brandenburg cites to the following four elements of collateral estoppel: "(1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a fully and fair opportunity to litigate; (4) a prior losing litigant." [R. 101, pp. 7–8 (quoting *Epps*, 99 F. Supp. 3d 692, 701 (E.D. Ky. 2015)) (internal quotation marks omitted). It is true that Kentucky courts often cite to these four elements when analyzing a collateral estoppel argument, usually citing to *Moore v. Commonwealth*, 954 S.W.2d 317 (Ky. 1997). *See, e.g., Middleton v. PNC Bank N.A.*, No. 2017-CA-01673-MR, 2019 WL 1224621, at *6 (Ky. Ct. App. Mar. 15, 2019); *Brock v. Commonwealth*, No. 2015-CA-000624-ME, 2016 WL 4709133, *5 (Ky. Ct. App. Sept. 9, 2016). However, the five elements cited above were outlined in the case of *Miller v. Administrative Office of Courts*, in which the Supreme Court of Kentucky cited to *Moore* for more general principles but ultimately cited to *Yeoman v. Commonwealth*, a post-*Miller* case, for the five elements of collateral estoppel. *See Miller*, 361 S.W.3d at 872. Those five elements are also reflective of the definition of issue preclusion found in the Restatement. *See* Restatement (Second) of Judgments § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Regardless, the Court notes that the four elements cited by Brandenburg are covered by the five elements listed above. Thus, this Court's analysis addresses all of these elements.

In its first preclusion argument, Brandenburg argues that "this Court must give preclusive effect to the State Proceeding and render judgment in favor of Brandenburg," citing the doctrine of collateral estoppel. [R. 101, p. 7]. More specifically, Brandenburg argues that the issue presented by its Amended Complaint is "whether Brandenburg properly billed Sprint through November 6, 2009 pursuant to its tariff on file with the [PSC]." *Id.* at 8; *see also* [R. 92, ¶¶ 3, 48 (Amended Complaint)]. This issue, Brandenburg argues, was fully and finally adjudicated by the state courts, which ultimately ruled that Brandenburg was not obligated under the state tariff to use the PIU method before November 6, 2009, the date of the PSC's Order. [R. 101, p. 8]. Notably, with respect to this specific issue, Sprint does not dispute that the basic elements of collateral estoppel are met, nor does it directly address Brandenburg's collateral estoppel arguments.[19] In fact, Sprint concedes "that the meaning and application of the state Duo Tariff as a matter of state law was 'actually decided' and is binding as a matter of state law." [R. 105, p. 18, n.8]; *see also id.* at 21 ("Sprint has taken the benefit of the state law ruling on and after November 6, 2009, and concedes that it lost that state law issue for prior periods."). Nevertheless, the Court will briefly address the elements of collateral estoppel.[20]

As noted above, the first element requires that "at least one party to be bound in the second case must have been a party in the first case." *Miller*, 361 S.W.3d at 871 (citation omitted). This element is easily satisfied, as both Sprint and Brandenburg were parties to the

---

[19] Sprint does argue that there is no final judgment on the merits in this case but makes this argument only with respect to its preemption counterclaims. [R. 105, pp. 14–15]. It does *not* make this argument with respect to whether collateral estoppel applies to the issue of whether Brandenburg was permitted under the state tariff to use the CPN method prior to November 6, 2009. Accordingly, the Court addresses Sprint's argument that there is no final judgment on the merits below, when addressing the state proceeding's preclusive effect, if any, on Sprint's preemption arguments.

[20] In doing so, the Court notes that "Kentucky courts have held that the principles of res judicata and collateral estoppel apply equally to administrative decisions." *Epps Chevrolet Co. v. Nissan North America, Inc.*, 99 F. Supp. 3d 692, 701 (E.D. Ky. 2015) (citing *Herrera v. Churchill McGee*, 680 F.3d 539, 547 (6th Cir. 2012)).

state proceeding. The second element requires that the issue raised in the second proceeding be the same as that raised in the first proceeding. *Id.* Here, the issue presented by Brandenburg's Amended Complaint is whether Brandenburg was allowed to bill Sprint using the CPN method prior to November 6, 2009. [R. 92, ¶¶ 3, 48 (Amended Complaint)]. This same issued was raised in Sprint's Administrative Complaint, in which it argued that Brandenburg was required under its state tariff to use the PIU method and asked the PSC to enter an order to that effect. [R. 9-3]. The second element is therefore satisfied.

Turning to the remaining elements, the Court notes that an issue has been actually litigated and decided if it was "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." Restatement (Second) of Judgments § 27 cmt d. And an issue is necessary or essential to the judgment if the judgment is dependent upon that specific issue. *Id.* cmts. i., j. Stated another way, mere dicta or alternative findings are typically not necessary to the judgment and should not be given preclusive effect. *Id.*; *cf. In re Nageleisen*, 523 B.R. at 530. Each of these elements is satisfied in this case. In the state proceeding, the PSC was asked by Sprint to decide which method of determining jurisdictional character was appropriate under the state tariff, [R. 9-3], it decided that that PIU method was the proper method, [R. 92-2], and the state courts ultimately concluded that, for the time period prior to November 6, 2009, the CPN method was acceptable. *See Sprint*, 2019 WL 4565546, at *5. There is therefore no question that this issue was "actually litigated" and "actually decided," resulting in a final judgment on the merits of that issue, nor is there any reason to debate that the issue was necessary or essential to the courts' rulings.[21] Again, Sprint does not dispute that these elements have been satisfied.

---

[21] To the extent Sprint argues that the state proceedings are not final, the Court addresses that argument below.

Lastly, the Court notes that neither party disputes that Sprint had a "realistically full and fair opportunity to litigate the issue" of whether the CPN method could be used under the state tariff, and neither party cites to any reason why it would be inequitable to give preclusive effect to the state court judgments. *See Columbia Gas*, 2014 WL 2711943, *4 (quoting *Berrier v. Bizer*, 57 S.W.3d 271, 281 (Ky. 2001)) (internal quotation marks omitted). Under these circumstances, and given the Court's analysis above (and Sprint's lack of objection), the Court finds collateral estoppel to be appropriate. The Court will therefore give preclusive effect to the state court orders on the specific issue of whether Brandenburg was required to use the PIU method under the terms of the state tariff prior to November 6, 2009.

However, this does not end the Court's analysis. Sprint has argued that Brandenburg's use of the CPN method prior to November 6, 2009 conflicts with federal law, namely, the federal tariff and federal filed rate doctrine. Thus, while the Court concludes that the parties may not relitigate whether Brandenburg was allowed to use the CPN method prior to November 6, 2009 under state law, the Court must now consider whether Sprint can raise its preemption arguments and if so, what effect preemption may have on application of the state court decisions.

### ii.    Sprint's Preemption Arguments

Brandenburg argues that Sprint's preemption arguments are barred by either collateral estoppel or res judicata. *See, e.g.*, [R. 98, p. 20 (Answer to Amended Counterclaims); R. 101, pp. 9–11, 20–21; R. 107, p. 4]. With respect to collateral estoppel, Brandenburg argues that Sprint had a full and fair opportunity to litigate its preemption issues in the state proceeding, and Sprint "*actually* raised and litigated" those issues. [R. 101, pp. 9–11].[22] However, Brandenburg

---

[22] Brandenburg makes these assertions when arguing that the Court must give preclusive effect to the state court judgments. *See* [R. 101, pp. 7–11].

overlooks at least two other essential elements of collateral estoppel. As noted above, the issue must have been "actually decided" in the prior action, and "the decision on the issue in the prior action must have been necessary to the court's judgment." *Miller*, 361 S.W.3d at 871 (quoting *Yeoman*, 983 S.W.2d at 465) (internal quotation marks omitted). The Court finds that these essential elements are not satisfied with respect to these preemption claims, and as a result, the doctrine does not bar the Court from considering those arguments.

In making its preemption arguments, Sprint essentially asks this Court to consider whether Brandenburg's use of the CPN method prior to November 2009 conflicts with federal law (i.e, the federal NECA tariff and the federal filed rate doctrine). *See, e.g.*, [R. 97, pp. 9, 21–25]. Sprint raised the same arguments to the Franklin Circuit Court (in a Motion to Alter, Amend, or Vacate), and again to the state's appellate courts. *See* [R. 101-6; R. 101-7; R. 101-9]. None of those courts addressed Sprint's preemption arguments. *See Brandenburg Tel. Co. v. Pub. Serv. Comm'n of Kentucky*, No. 10-CI-00019 (Franklin Cir. Ct. Aug. 20, 2013); *Brandenburg I*, 2015 WL 1880787, at *7–9; *Brandenburg II*, 2019 WL 4565546, at *5.[23] Thus, there is no question that these specific issues were not "actually decided" by the PSC or the state courts, nor could they have been "necessary to the [courts'] judgment[s]." *Miller*, 361 S.W.3d at 872 (quoting *Yeoman*, 983 S.W.2d at 465). Therefore, the doctrine of collateral estoppel, or issue preclusion, does not bar consideration of Sprint's preemption arguments.

---

[23] Apparently, the PSC raised federal concerns to the state appellate court. In a footnote, the Court of Appeals of Kentucky noted the PSC's concern "that the effect of the circuit court's order is to 'award[ ] the PSC jurisdiction over interstate calls—calls that are exclusively within the province of the federal government.'" *Brandenburg II*, 2019 WL 4565546, at *2 n.5. But, the court explained, "[f]ederal guidance issued after the trial court rendered its initial decision in this matter eliminated" the disparity between intrastate and interstate access rates. *Id.* (citing to *In re Connect Am. Fund, et al.*, 26 F.C.C. Rcd 17663, 17677 (F.C.C. Nov. 17, 2011)). Thus, the court explained, "this case has no prospective application after July 2013" and the PSC's concerns were moot. *Id.* It is unclear exactly how this reasoning addresses the PSC's argument, and it certainly does not address Sprint's federal preemption arguments. Regardless, even if that court was attempting to address concerns over a conflict with federal law, its reasoning (limited to the footnote cited above) was certainly not "necessary" to its judgment.

### b.   Res Judicata

The Court next considers Brandenburg's argument that res judicata bars consideration of Sprint's preemption arguments. [R. 101, pp. 12–17]. Res judicata[24] "stands for the principle that once rights of the parties have been finally determined, litigation should end." *Id.* (quoting *Slone v. R&S Mining, Inc.*, 74 S.W.3d 259, 261 (Ky. 2002)) (internal quotation marks omitted). Thus, its "very purpose . . . is to preclude repetitious actions." *Id.* at 872 (citing *Harrod v. Irvine*, 283 S.W.3d 246, 250 (Ky. Ct. App. 2009)). To invoke the doctrine, three elements must be satisfied: "(1) there must be an identity of parties between the two actions; (2) there must be an identity of the two causes of action; and (3) the prior action must have been decided on the merits." *Id.* (citing *Harrod*, 283 S.W.3d at 250). If these elements are met, the doctrine applies "even though the plaintiff is prepared in the second action (1) To present evidence or grounds or theories of the case not presented in the first action, or (2) To seek remedies or forms of relief not demanded in the first action." *Reesor v. City of Audubon Park*, No. 2016-CA-000127-MR, 2017 WL 2609243, at *3 (Ky. Ct. App. June 16, 2017) (quoting *Dennis v. Fiscal Court of Bullitt County*, 784 S.W.2d 608, 610 (Ky. Ct. App. 1990)) (internal quotation marks omitted).

### i.   Identity of Parties

With respect to the first element, the Court finds that there exists "an identity of parties between the two actions." *Miller*, 361 S.W.3d at 872 (citation omitted). Before the PSC, the parties were Sprint and Brandenburg, the same parties in the present case. Neither party disputes that this element has been satisfied, and the Court finds that there is an identity of parties

---

[24] Under Kentucky law, the term "res judicata" is sometimes used as an umbrella term, to encompass both claim preclusion and issue preclusion. *See Miller v. Admin. Office of the Courts*, 361 S.W.3d 867, 871 (Ky. 2011) (citing *Yeoman v. Com., Health Policy Bd.*, 983 S.W.2d 459, 464–65 (Ky. 1998)). The Court uses the term "res judicata" in this opinion to refer to claim preclusion only. *See Miller*, 361 S.W.3d at 871 (explaining that it uses the term res judicata "to mean claim preclusion").

between the state proceedings and this federal suit. The first element of res judicata is therefore satisfied.

### ii.    Identity of Causes of Action

The second element of res judicata requires "an identity of the two causes of action." *Miller*, 361 S.W.3d at 872 (citation omitted). Closely intertwined with this element is the rule against splitting causes of action. *Coomer v. CSX Transp., Inc.*, 319 S.W.3d 366, 371 (Ky. 2010). In fact, the rule is considered to be "a subsidiary of the doctrine of res judicata." *Id.* at 371 n.9 (quoting *Watts ex rel. Watts v. K, S & H*, 957 S.W.2d 233, 236 (Ky. 1997)). As Kentucky's courts have explained, the rule "is simply the aspect of the doctrine [of res judicata] which requires the court to determine the dimension or scope of the 'cause of action' in the prior suit (i.e., to decide if the second action involved issues which should have been litigated in the first action, but were not, and are therefore precluded)." *Ressor*, 2107 WL 2609243, at *4 (citations omitted). "Essentially, it is one aspect to be considered when determining whether there is identity of the causes of action." *Coomer*, 319 S.W.3d at 371 n.9.

The rule against splitting causes of action "is an equitable rule, limiting all causes of action arising out of a single 'transaction' to a single procedure." *Id.* (quoting *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 193 (Ky. 1994)) (internal quotation marks omitted). "It rests upon the concept that 'parties are required to bring forward their whole case' and may not try it piecemeal." *Id.* (quoting *Arnold v. K-Mart Corp.*, 747 S.W.2d 130, 132 (Ky. Ct. App. 1988)). The rule therefore prohibits subsequent litigation of "not only [] the points upon which the [first] court was required by the parties to form an opinion and pronounce judgment, but [] every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable

diligence, might have brought forward at the time." *Id.* (quoting *Arnold*, 747 S.W.2d at 132) (internal quotation marks omitted).

Accordingly, to determine whether an identity of causes of action exists under this rule, Kentucky courts employ the "transactional approach." *Lawrence v. Bingham Greenebaum Doll, L.L.P.*, 599 S.W.3d 813, 826 (Ky. 2019) (citation omitted). Under this approach, "[i]dentity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'" *Hashemian v. Louisville Regional Airport Authority*, 493 S.W.3d 843, 846 (Ky. Ct. App. 2016) (quoting *Sanders Confectionary Products, Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 484 (6th Cir. 1992)) (internal quotation marks omitted). Thus, the reviewing court must "compare the factual issues explored in the first action with the factual issues to be resolved in the second" to determine whether there exists a "common nucleus of operative fact" among the two cases. *Lawrence*, 599 S.W.3d at 826 (quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1301–02 (11th Cir. 2001)) (internal quotation marks omitted). In the context of a res judicata claim, "the test for 'common nucleus of operative fact' . . . is not simply one of whether the two claims are related to or may materially impact one another." *Id.* (quoting *In re Piper*, 244 F.3d at 1301) (internal quotation marks omitted). Instead, "[i]f the factual scenario of the two actions parallel, the same cause of action is involved in both." *Id.* (quoting *Motient Corp. v. Dondero*, 269 S.W.3d 78, 83 (Tex. App. 2008)) (internal quotation marks omitted). Accordingly, under the rule against splitting causes of action, it is possible for the doctrine of res judicata to apply even when a claim raised in the second action was not raised in the first action but *could have been* raised in that initial case. *See, e.g.*, *Hashemian*, 493 S.W.3d at 846 ("Res judicata bars not only those claims previously raised, but those which could have been raised in the prior action.").

To determine if there is an identity of causes of action in this case, the Court looks closely at the claims raised in the state proceedings as compared to Sprint's claims in this federal suit. *See Lawrence*, 599 S.W.3d at 826. In the Administrative Complaint, Sprint asked the PSC to determine whether Brandenburg was improperly billing interstate calls at intrastate rates, in violation of both state and federal law. *See* [R. 9-3; R. 92-2, pp. 5–6]. Specifically, Sprint alleged that "Brandenburg has been violating and continues to violate KRS Sections 278.040, 278.260[,] 278.030(1), and 278.030[,] as well as Sections 201(b) and 203 of the [Communications] Act, 47 U.S.C. §§ 201(b) and 203, by inappropriately and unlawfully charging Sprint intrastate access rates for terminating jurisdictionally interstate traffic from wireless phones." [R. 9-3, ¶ 12]. Sprint continued, "These rates are unreasonably high when misapplied to jurisdictionally interstate traffic and are not set forth in Brandenburg's interstate tariff. The access rates that Brandenburg seeks to impose upon Sprint for terminating such traffic are those set forth in their intrastate tariff." *Id.* Sprint went on to allege that Brandenburg billed "Sprint its higher intrastate access charges for terminating the call instead of its interstate access rates set forth in the [NECA] tariffs on file with the FCC," *id.* ¶ 15, and "misclassif[ied] traffic as intrastate and thus bill[ed] a disproportionate amount at the higher intrastate rate rather than the appropriate interstate rate." *Id.* ¶ 16. Sprint even went so far as to cite to the federal tariff, arguing that that tariff's "language could not be any clearer." *Id.* ¶ 20. Having cited to the federal tariff and a 2003 FCC ruling, Sprint argued that "[t]he application of existing law to the issue raised in Sprint's Complaint requires a finding that a call that originates in one state and terminates in another is an interstate call for which interstate access charges could be assessed." *Id.* ¶ 21.

On the other hand, Sprint contends that its counterclaims in this federal suit focus on application or enforcement of the state court rulings which prohibit retroactive application of the

PSC's order. For example, Sprint argues, "The *Nov. 2009 PSC Order* aligned state law with federal law. However, on appeal, the Kentucky courts reversed the PSC's decision as applied to Brandenburg's bills issued between January 2002 and November 2009. That created a conflict with federal law." [R. 97, ¶ 49]. Sprint goes on to argue, "Brandenburg's attempt to enforce state law to collect state rates for interstate communications is in direct conflict with the federal Communications Act, and, in such a circumstance, federal law preempts state law." *Id.* ¶ 50. "Accordingly," Sprint argues, "federal law prohibits the enforcement of the state Duo Tariff to impose state rates on the interstate minutes." *Id.* Sprint goes on to allege that "[t]he Kentucky courts' holdings create a direct and irreconcilable conflict between the two tariffs." *Id.* ¶ 64. This conflict, Sprint maintains, "must be resolved by enforcing federal law and the NECA Tariff and preempting state law." *Id.* ¶ 66. Sprint argues that, because these preemption claims were triggered by the state court rulings, it could not possibly have raised these issues to the PSC.

The Court disagrees with Sprint's characterization of its preemption claims. While it attempts to focus its claims on the conflict between the state court's rulings and federal law, a closer examination of its counterclaims makes clear that it is raising the same federal issues that it previously raised before the PSC. Before the PSC, Sprint argued that Brandenburg's use of the CPN method allowed Brandenburg to charge intrastate rates for interstate calls, in violation of state and *federal* law and in contradiction of the *federal* tariff and FCC guidance, as previously noted. *See, e.g.*, [R. 9-3, ¶¶ 12, 15, 16]. Before this Court, in its Amended Answer and Counterclaims, Sprint argues that Brandenburg's use of the CPN method prior to November 6, 2009 allows Brandenburg to charge intrastate rates for factually interstate calls, in violation of federal law. [R. 97, pp. 21–25] Though Sprint, in response to Brandenburg's preclusion arguments, tries to argue otherwise, the pleadings are clear. Sprint has always recognized that

Brandenburg's use of the CPN method may conflict with federal law because it allegedly allows Brandenburg to charge intrastate rates for interstate calls, in violation of the state tariff, the federal tariff, the filed rate doctrine, and so on. Simply stated, then, Sprint's claims before the PSC are the same as the preemption claims it first raised in this Court in 2020. *Compare* [R. 9-3 (Administrative Complaint)], *with* [R. 97 (Amended Answer and Counterclaims)].

Furthermore, there is no doubt that Sprint raised its preemption arguments with the state courts. First, after receiving an unfavorable ruling from the Franklin Circuit Court in 2012, Sprint filed a Motion to Alter, Amend, or Vacate, arguing, among other things, that the circuit court's ruling conflicted with federal law. [R. 101-6, p. 9–10 (Sprint's Motion to Alter, Amend, or Vacate)]. Sprint raised the same arguments in its briefs to the state's appellate courts, seeking review of the Franklin Circuit Court's decisions. For example, in its 2013 brief to the Court of Appeals of Kentucky, Sprint argued that the circuit court had failed to consider the filed rate doctrine, and both state and federal law prohibited Brandenburg from using the CPN method to determine jurisdiction of calls. [R. 101-7, pp. 20–21, 28–30 (Sprint's 2013 Appellate Brief)]. It raised similar arguments in a motion seeking discretionary review from the state's highest court. [R. 101-9, pp. 10–11 (Sprint's 2015 Motion for Discretionary Review)]. Later, in its 2017 brief to the Court of Appeals, Sprint again argued that, if the appellate court affirmed the lower court, "it will be interpreting the [Duo County tariff] so as to contradict federal law." [R. 101-10, p. 13 (Sprint's 2017 Appellate Brief)].

Nevertheless, Sprint argues that res judicata is inapplicable, citing to the PSC's limited jurisdiction. As Sprint notes, claim preclusion does not apply when a party was unable to obtain its desired remedy in the first proceeding due to jurisdictional limitations. *See* [R. 105, p. 13]; *Miller*, 361 S.W.3d at 873 (citing Restatement (Second) of Judgments § 26(1)(c) (1982); *Cream*

*Top Creamery v. Dean Milk Co.*, 383 F.2d 358, 363 (6th Cir. 1967)). For example, res judicata does not bar a litigant's assertion of claims that were previously dismissed for lack of subject matter jurisdiction in an earlier suit. *See Miller*, 361 S.W.3d at 873–74. In the state proceeding, the PSC's jurisdiction was limited. The PSC "has jurisdiction over the rates and services of utilities providing service in this state, subject to judicial review." *Strother v. AT&T Commc'ns of S. Cent. States, Inc.*, No. 2007-00415, 2008 WL 596158, *1 (Ky. P.S.C. Feb. 28, 2008) (citing KRS § 278.040(2)). Thus, it can "investigate rates relating to long-distance phone calls made within the state of Kentucky." *Id.* However, the FCC has jurisdiction over *interstate* calls, or calls originating in Kentucky but terminating in another state. *Id.* Given the PSC's limited jurisdiction, Sprint argues that it would have been unable to obtain a resolution on its federal preemption claims in the first proceeding, and as a result, claim preclusion should not apply. *See* [R. 105, p. 13].

But even assuming Sprint is correct on this point, Sprint conveniently overlooks the jurisdiction of the Kentucky state courts. Kentucky law is clear that, when reviewing an order of the PSC, Kentucky's "judiciary is limited to determining whether the Commission's decision is unreasonable or unlawful." *Citizens for Alternative Water Solutions v. Kentucky Pub. Serv. Comm'n*, 358 S.W.3d 488, 489–90 (Ky. Ct. App. 2011) (citing KRS § 278.410(1)); *see also Brandenburg I*, 2015 WL 1880787, at * 8 (remanding for application of this standard of review); *Brandenburg II*, 2019 WL 4565546, at *5 (affirming the Franklin Circuit Court's holding that retroactive application of the PSC's order was unlawful). To be held "unlawful," the PSC's order must violate a state or federal statute or constitutional provision. *See, e.g.*, *National Southwire Aluminum Co. v. Big Rivers Elec. Corp.*, 785 S.W.2d 503 (Ky. Ct. App. 1990)). In other cases, Kentucky's state courts have considered whether a PSC order was unlawful because it was

allegedly preempted by certain FCC holdings, *Cincinnati Bell Telephone Co. v. Kentucky Pub. Serv. Comm'n*, 223 S.W.3d 829 (Ky. Ct. App. 2007), or because it violated the federal Supremacy Clause, *Bullitt Utilities, Inc. by Keats v. Kentucky Pub. Serv. Comm'n*, No. 2018-CA-000559-MR, 2019 WL 2157926, *5–6 (Ky. Ct. App. May 17, 2019). *See also American Elec. Power Co., Inc. v. Kentucky Pub. Serv. Comm'n*, No. 85-5129, 1986 WL 16708, at *3 (6th Cir. Mar. 24, 1986) (holding that district court properly abstained from considering a complaint that raised federal preemption and Supremacy Clause arguments, because those arguments had also been raised in a state court appeal of the PSC's order and neither party "den[ied] that they will have an adequate opportunity to raise their federal claims in the pending state action").

Furthermore, Sprint has never denied that the Kentucky state courts possessed the jurisdiction necessary to consider its federal preemption arguments.[25] In fact, in the state proceedings, Sprint raised these very preemption arguments numerous times to the Kentucky state courts, as noted above, belying its current arguments that center on the *PSC's* jurisdiction. Now, Sprint sidesteps any discussion of the state courts' jurisdiction to consider those issues and instead argues to this Court that the *PSC* lacked the jurisdiction necessary to consider preemption, thereby precluding application of res judicata. *See* [R. 105, p. 13]. But in doing so, Sprint fails to identify any authority suggesting that the Court's res judicata analysis rests on the jurisdiction of the PSC rather than the state courts. And perhaps more importantly, Sprint ignores the fact that Brandenburg's res judicata arguments target the *state court decisions* that evaluate the PSC's order and specifically, the state court's ruling on the unlawfulness of the retroactive

---

[25] In fact, the Court of Appeals of Kentucky *did* address at least some of the federal concerns raised by the parties. As noted above, *see supra* note 23, the state appellate court addressed the PSC's concern "that the effect of the circuit court's order is to 'award[ ] the PSC jurisdiction over interstate calls—calls that are exclusively within the province of the federal government,'" but ultimately found those concerns to be moot. *Brandenburg II*, 2019 WL 4565546, at *2 n.5. One could argue that, in addressing this, the Court of Appeals acknowledged its jurisdiction over those federal issues.

application of the PSC's decision. In other words, Brandenburg asks this Court to give preclusive effect to the state courts' ruling that, prior to 2009, Brandenburg was permitted to use the CPN method to determine the jurisdictional nature of a call. Yet, Sprint attempts to distract by focusing on the PSC's limited jurisdiction, and in doing so, wholly fails to address the relevant state court jurisdiction and orders.

Other cases with similar procedural histories indicate that the state courts' jurisdiction is determinative. For example, in *Strickland v. City of Albuquerque*, 130 F.3d 1408 (10th Cir. 1997), the Tenth Circuit addressed a similar jurisdictional argument. There, the plaintiff-appellant was terminated from his job with the city due to a positive drug test, and his termination was ultimately affirmed by the city's Personnel Board. *Id.* at 1409–10. Pursuant to state statute, he sought judicial review of that decision in state court. *Id.* at 1410. The state court's review was limited to determining whether the Personnel Board acted arbitrarily or capriciously or whether its order was supported by substantial evidence or otherwise unlawful. *Id.* The state court eventually affirmed the Personnel Board's decision. *Id.* Meanwhile, the plaintiff filed suit in federal district court, asserting a 42 U.S.C. § 1983 action. *Id.* The district court found that this federal claim was barred by the doctrine of res judicata, and the Tenth Circuit affirmed. *Id.* at 1410–11. In doing so, the Tenth Circuit explained that the allegations in the state proceeding were "almost identical to those underlying plaintiff's § 1983 claims." *Id.* at 1412. Nevertheless, the plaintiff argued that "his federal claims should not be precluded because he could not have asserted them in the City administrative hearings." *Id.* The Tenth Circuit found that this argument "misses the point" because "[t]he issue is whether [the federal claims] are barred because they could have been asserted in the [state] action that resulted in a judgment in favor of the City." *Id.* On this point, the Court found that those § 1983 claims could have been

asserted in the state court, and they had in fact been argued to the state court, though that court ultimately did not rule on those issues. *Id.* at 1412–13. The Court therefore found that res judicata barred consideration of the plaintiff's § 1983 claim. *See also Swapshire v. Baer*, 865 F.2d 948, 952 (1989) (applying claim preclusion where appellant could have raised his federal claims to the state court sitting in judicial review of an administrative decision).

Similarly, in the present case, Sprint sought judicial review of the PSC's decision in Franklin Circuit Court. During the course of that judicial review process (including the appeal to the Court of Appeals of Kentucky), Sprint argued federal preemption. As the Court has already explained, the state courts had jurisdiction to consider those issues, even if the PSC did not. Plaintiff now attempts to raise the same federal preemption claims to this Court. Brandenburg has argued that res judicata precludes consideration of those issues or, in other words, that the Court must give preclusive effect to the state courts' rulings.  Because Sprint's present federal preemption arguments mirror those raised in the state proceeding (both before the PSC and the state courts), and there was no jurisdictional bar to the state court's consideration of those arguments, the Court find that an "identity of the causes of action" exists in this case.

It is true that the Franklin Circuit Court ultimately concluded that the PSC's Order was unlawful for other reasons (i.e., for violating Kentucky's statutory prohibition on retroactive rule-making). *See* [R. 92-4 (Franklin Cir. Ct. 2017 Opinion)]. It did *not* address Sprint's federal preemption arguments, nor did the Kentucky Court of Appeals squarely address them when reviewing the circuit court's order on appeal. *See Brandenburg Tel. Co. v. Pub. Serv. Comm'n of Kentucky*, No. 10-CI-00019 (Franklin Cir. Ct. Aug. 20, 2013) (denying Motion to Alter, Amend, or Vacate); *Brandenburg I*, 2015 WL 1880787, at *7–9; *Brandenburg II*, 2019 WL 4565546, at *5; *supra* note 25. But the fact that the state courts did not address these federal preemption

arguments is of no consequence to the Court's res judicata analysis. The doctrine covers not only those claims actually litigated and decided (as does collateral estoppel)[26] but also those claims which *could have been* raised and decided in the earlier suit (unlike collateral estoppel). *See Miller*, 361 S.W.3d at 871.

In sum, the state courts—conducting a judicial review of the PSC's Order—possessed the authority to consider whether that Order was unlawful because it was preempted by federal law or the federal tariff. Sprint raised these very arguments to the PSC and to the state courts, and now attempts to raise them again to this Court. Accordingly, for the reasons stated above, the Court finds that the second element of res judicata—namely, an identity of causes of action—is satisfied in this case.

### iii.    Final Judgment on the Merits

To satisfy this final element, "the prior action must have been decided on the merits." *Miller*, 361 S.W.3d at 872 (citation omitted). In Kentucky, "[a] judgment on the merits is one which is based on legal rights as distinguished from mere matters of practice, procedure, jurisdiction or form." *Martin v. Personnel Bd.*, 959 S.W.2d 779, 780–81 (Ky. Ct. App. 1997) (citations omitted). Thus, if a case is dismissed for lack of subject matter jurisdiction, failure to name an indispensable party, or similar reasons, it has not been adjudicated on the merits. *See id.*; *Clemmer v. Rowan Water, Inc.*, 277 S.W.3d 633, 635 (Ky. Ct. App. 2009); *Hamm v. Workman*, No. 2009-CA-001767-MR, 2009 WL 2192790, at *2 (Ky. Ct. App. July 24, 2009).

---

[26] Interestingly, under either doctrine, "[a] final valid judgment, even if erroneous on either the facts or the law, must be given a binding effect as res judicata or collateral estoppel, in either a federal or state tribunal." *Borg-Warner Protective Servs. v. Guardsmark, Inc.*, 946 F. Supp. 495, 498 (E.D. Ky. 1996) (quoting 1B Moore's Federal Practice § 0.0405[4.-1], p. III-23).

Sprint argues that the PSC could not possibly have resolved its claims on the merits, as the PSC lacked authority to interpret the federal tariff and award damages. *See* [R. 105, p. 13].[27] As noted above, Sprint's arguments regarding the PSC's limited jurisdiction overlook the jurisdiction of the state courts sitting in judicial review of the PSC's order. Additionally, Sprint's argument that the state proceeding was not decided on the merits misunderstands what it means for a judgment to have been "decided on the merits" for purposes of res judicata. As noted above, a judgment is considered decided on the merits if it was resolved based on legal rights rather than jurisdiction or procedure. *See, e.g.*, *Martin*, 959 S.W.2d 779 at780–81 (citations omitted). Here, there is no dispute that the underlying state proceeding was *not* dismissed for lack of jurisdiction or under some other procedural rule; rather, the PSC reached the merits of Sprint's claims relating to the state tariff, and that decision then made its way through the state appeal process. At no point was it overruled on procedural grounds. Sprint's arguments[28] with respect to this element are therefore baseless, and the Court finds that the state proceeding was resolved on the merits (though not on the merits of federal preemption).

In sum, the Court finds that each element of res judicata is satisfied. The doctrine of res judicata (or claim preclusion) therefore bars this Court's consideration of Sprint's preemption arguments.

---

[27] Sprint argues that, given the PSC's limited jurisdiction, the case could not have been decided on the merits, and there was no opportunity to litigate the federal preemption issues. *See* [R. 105, p. 13]. The "opportunity to litigate" is an element of collateral estoppel, not res judicata, and the Court has already explained that the doctrine of collateral estoppel is inapplicable to Sprint's preemption claims. *See supra* Section III(B)(2)(a)(ii). Accordingly, the Court addresses this argument only with respect to whether the state proceeding was decided on the merits, as required by res judicata.

[28] Sprint also makes other arguments on this point, namely, that there was no final resolution to the state proceedings because it was not remanded, [R. 105, p. 14]. The Court finds this argument to be nonsensical and will not address it further, other than to note that the Franklin Circuit Court initially remanded the case to the PSC, but the state appellate courts included no such remand language. *See generally Brandenburg I*, 2015 WL 1880787; *Brandenburg II*, 2019 WL 4565546.

### 3. Judicial Estoppel

Brandenburg next argues that the doctrine of judicial estoppel should prevent Sprint from challenging the state court decisions. [R. 101, pp. 12–17]. This doctrine[29] "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). Its purpose is "to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)).

Because the doctrine's purpose is to prevent "improper use of judicial machinery," it is considered "an equitable doctrine invoked by a court at its discretion." *New Hampshire*, 532 U.S. at 750 (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)) (internal quotation marks omitted). As such, it is a flexible doctrine. *Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 245 (6th Cir. 2021). Thus, the Supreme Court has explained, "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *New Hampshire*, 532 U.S. at 750. Nevertheless, the Court identified several factors for district courts to consider when applying the doctrine:

> (1) whether "a party's later position [is] clearly inconsistent with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

---

[29] Unlike collateral estoppel and res judicata, this doctrine is governed by federal standards. *See Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 243 n.6 (6th Cir. 2021) (citing *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 n.4 (6th Cir. 1982)); *Watkins v. Bailey*, 484 F. App'x 18, 20 n.1 (6th Cir. 2012).

*Shufeldt*, 855 F. App'x at 243 (quoting *New Hampshire*, 532 U.S. at 750–51). In addition to these three factors, the district court may be informed by "additional considerations . . . in specific factual contexts." *New Hampshire*, 532 U.S. at 751. Stated another way, "judicial estoppel is a flexible doctrine that is designed to consider all of the circumstances in evaluating whether the [party's] inconsistent statements justify estopping the [party] from pursuing [its] claims." *Thompson v. Davidson Transit Organization*, 725 F. Supp. 2d 701, 710 (M.D. Tenn. 2010). Ultimately, however, the doctrine of judicial estoppel "should be 'applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement.'" *New Hampshire*, 532 U.S. at 751 (quoting *Teledyne Indus., Inc.*, 911 F.2d at 1218).

The Court now addresses each of the three factors outlined above, as well as "additional considerations" arising from the specific facts of this case. For the reasons set forth below, the Court finds that judicial estoppel bars consideration of Sprint's preemption arguments.

### a.  Clearly Inconsistent Positions

As noted above, the Court should consider whether Sprint's current position was "clearly inconsistent" with its earlier position.[30] *Id.* at 750–51. On this point, Brandenburg points to Sprint's repeated assertions that the PSC possessed jurisdiction to resolve the parties' disputes. [R. 101, p. 13]. For example, Sprint first brought its claims to the PSC in April 2008. [R. 9-3 (Administrative Complaint)]. Then, in March 2009, Sprint sought dismissal, or a stay, of

---

[30] To the extent that the inconsistent statement must be made under oath, the Sixth Circuit has explained that "the 'under oath' requirement is met when a party previously asserted an inconsistent position in a written filing and argued the motion on the merits before the court." *Shufeldt*, 855 F. App'x at 245 (citation omitted). In the present case, there is no dispute that Sprint's statements regarding the PSC's jurisdiction were made in written filings with this Court, specifically a Motion to Dismiss, [R. 9], and the merits of that motion were heard and decided by the Court. [R. 25, pp. 35]. The "under oath" requirement has therefore been satisfied.

Brandenburg's complaint in this Court for lack of subject matter jurisdiction, insisting that the dispute centered on state law and arguing that the PSC possessed "primary" jurisdiction to resolve that dispute. [R. 9-2, pp. 11–15]. "Having continuously taken this position since 2008," Brandenburg argues, "Sprint is judicially estopped from arguing that the Parties' dispute actually turns on federal law and Brandenburg may not enforce the outcome of the State Proceeding." [R. 101, p. 12].

Sprint, however, insists that its "position is—and has always been—that the PSC had jurisdiction and authority over intrastate communications and tariffs, while interstate communications were governed by federal law." [R. 105, p. 21]. Sprint specifically asked the PSC to order a refund of *intrastate* access charges but claims it could not assert "federal claims and defenses in the PSC case, given that body's limited jurisdiction." *Id.*[31] Sprint further contends that it was not necessary to assert such federal claims and defenses in this Court until the PSC order was finally litigated to conclusion and applied only prospectively by the state courts, because only then was there a potential conflict with federal law. *Id.* Stated another way, Sprint claims the federal preemption issues did not "ripen" until the state court litigation concluded.

Sprint's argument can be charitably described as disingenuous. In March 2009, Sprint sought dismissal of this matter or, alternatively, a stay pending the PSC proceedings because, it argued, the core dispute between the parties hinged on state law, which the PSC had special expertise to resolve. *See generally* [R. 9]. In doing so, Sprint acknowledged that the PSC's

---

[31] On this point, Sprint argues that it "followed the right path in litigating state refund issues before the PSC" and then pursuing its federal claims in this Court. *See* [R. 105, p. 6]. But the cases that Sprint cites are not supportive of that position, and neither case touches on the judicial estoppel concerns at play in this case. *See In the Matter of Thrifty Call*, 19 F.CC. Rcd. 22240 (2004); *LDDS Communications, Inc. v. United Telephone of Florida*, 15 F.C.C.R. 4950 (2000).

jurisdiction was limited to resolving issues concerning the state tariff. *See, e.g.*, *id.* at 5 ("KRS 278.040 provides the PSC with jurisdiction 'over the regulation of rates and service of utilities' within Kentucky."); *id.* at 6 (explaining that PSC possesses jurisdiction "to interpret Kentucky tariffs when the application or meaning of such tariffs is in dispute" (citations omitted)). Nevertheless, Sprint repeatedly argued in its Motion to Dismiss, [R. 9], and its related reply brief, [R. 14], that the PSC possessed the authority to resolve the parties' dispute, other than entering a final money judgment:

- "At the very least, jurisdiction over this tariff dispute should be deferred to the agency with regulatory oversight: the PSC. *The PSC is uniquely qualified to assess and act upon the parties' dispute. . . .*" [R. 9, pp. 11–12 (emphasis added)];

- "The district court must give way to PSC primary jurisdiction." *Id.* at 12;

- "[T]he PSC Action is closely intertwined with this case and *the dispositive issue is one that falls within the jurisdiction of the PSC*." *Id.* at 15 (emphasis added);

- "[R]esolution of Brandenburg's claims calls for a comprehensive evaluation of the [state] tariff, and the proper means for calculating switched access charges. *The PSC is the body to sort out such issues in the first instance.*" *Id.* at 16 (emphasis added);

- "[T]his matter is already before the agency with the requisite expertise to resolve the parties' substantive dispute, making court intervention premature and problematic." [R. 14, p. 1];

- "By stepping in *the [District] Court would thus be usurping the PSC's role and interfering with the PSC's authority to set rates and to interpret tariffs*." *Id.* at 3 (emphasis added);

- "The PSC and the parties have already dug into the matter and expended substantial resources in an effort to resolve *the dispositive question* in that forum. The PSC has full authority to interpret Brandenburg's intrastate tariff *and thereby resolve the issues that separate the parties*, and there is every indication the PSC will exercise that authority promptly." *Id.* at 6 (emphasis added).

- "The PSC can and will interpret the tariff and decide what is owed. *If additional proceedings are needed to obtain judgment to any collect amounts that are determined to be due, the collecting party can return to Court. However, because the issue directly requires a agency to engage in tariff interpretation, the Court cannot substitute its own judgment for the agency's as Brandenburg claims.*" *Id.* at 7 (emphasis added).

Sprint clearly represented to this Court that the parties' dispute involved "dispositive" matters of state law and required interpretation of the state tariff, and the PSC—which could consider *only* those limited issues—could fully resolve the "issues that separate the parties." *Id.* at 6. In other words, in its quest to litigate before the PSC, Sprint characterized the core dispute between the parties as involving "dispositive" issues of state law and the state tariff.

Based on these prior assertions, Brandenburg argues that Sprint must be estopped from now claiming that federal preemption requires the state court outcome to be overturned. To explain its tardy, shifting position—which arose only after its loss in state court regarding the retroactive application of the PSC's ruling—Sprint now argues that the federal preemption issues only "ripened" once the state court proceedings concluded. [R. 105, p. 21]. This argument is, again, disingenuous at best. Sprint knew from the get-go that the disputed calls involved overlapping issues of state and federal regulation. In Sprint's Administrative Complaint to the

PSC, Sprint asked the PSC to determine whether Brandenburg was improperly billing interstate calls at intrastate rates, in violation of both state *and* federal law. *See* [R. 9-3, pp. 5–6 (Administrative Complaint)]. But in this case, Sprint argued the "dispositive" issues involved the *intrastate* tariff, urging this Court to dismiss or stay the matter until the PSC could resolve the parties' dispute, and then the parties could return to this Court to enforce any damages award by the PSC. *See, e.g.*, [R. 14, p. 7 ("The PSC can and will interpret the tariff and decide what is owed. If additional proceedings are needed to obtain judgment to collect any amounts that are determined to be due, the collecting party can return to [District] Court.")].

In sum, the Court finds that Sprint's current position before this Court—namely, that this matter turns on Sprint's federal preemption arguments—is "clearly inconsistent" with its earlier arguments that the PSC possessed the expertise and jurisdiction to resolve the full breadth of the issues between the parties, specifically, issues requiring application of state law and interpretation of the state tariff. Sprint's insistence that federal issues were not triggered until after the state court rulings is contradicted by the record and by its own pleadings before the PSC. Federal issues were clearly at play in Sprint's Administrative Complaint. However, as explained below, *see infra* Section III(B)(3)(d), upon understanding that the state route provided a more favorable look-back period, Sprint squatted on its federal claims, urged this Court to dismiss or stay, and insisted that the PSC—which it acknowledged possessed only the limited jurisdiction to interpret the *state* tariff—could fully resolve the parties' dispute.

Sprint's inconsistent position regarding the nature of this suit might best be described as legal, not factual. There is a split among the circuits as to whether the doctrine can apply to such switched legal positions. Some federal courts have concluded that the doctrine applies only to inconsistent factual opinions. *See Minnieland Private Day School, Inc. v. Applied Underwriters*

*Captive Risk Assurance Company, Inc.*, 867 F.3d 449, 458 (4th Cir. 2017) (citation omitted).

Others have applied the doctrine to shifting legal positions, or at least expressed a willingness to

do so. *See In re Cassidy*, 892 F.2d 637, 641–42 (7th Cir. 1990); *Helfand v. Gerson*, 105 F.3d

530, 535 (9th Cir. 1997). The Sixth Circuit, however, has not directly addressed the issue. It has

noted that the doctrine of judicial estoppel "does not *usually* apply to shifting legal arguments; it

*typically* applies to shifting factual arguments." *Law Office of John H. Eggertsen P.C. v. C.I.R.*,

800 F.3d 758, 766 (6th Cir. 2015) (emphasis added). However, it has not expressly held that the

doctrine applies *only* to shifting factual arguments.

 More importantly, case law from this circuit suggests that the doctrine *can* apply to

shifting legal arguments (or at least, questions of law applied to fact). *See Shufeldt*, 855 F. App'x

at 243–46 (finding that a party made inconsistent statements for purposes of judicial estoppel

where he asserted that his claims had been timely filed, then later argued that the claims were

time-barred when suing his attorney for legal malpractice); *Valentine-Johnson v. Roche*, 386

F.3d 800, 811–12 (6th Cir. 2004) (applying judicial estoppel where party switched positions as to

whether the district court could hear the plaintiff's claims); *Warda v. Comm'r*, 15 F.3d 533, 538–

39 (6th Cir. 1994) (applying judicial estoppel to positions regarding who held rightful title to real

property). For example, in *Valentine-Johnson v. Roche*, the plaintiff brought several employment

claims against her former employer. 386 F.3d at 806. Her wrongful termination claim ultimately

found itself before an administrative law judge ("ALJ"), while her retaliation, discrimination,

and hostile workplace claims (for conduct occurring prior to her termination) were brought in

district court. *Id.* at 806–07. The employer argued that the ALJ lacked jurisdiction because the

termination claim would be heard in district court, with the plaintiff's other claims. *Id.* at 807.

Though this position was incorrect, the ALJ was persuaded and, as a result, advised plaintiff that

she could have her "complete case" heard in federal court. *Id.* at 810. The plaintiff then attempted to pursue her termination claim in her federal case, as the ALJ and the employer had suggested. *Id.* But once in district court, the employer made a "180-degree change in its position" and argued that the plaintiff had to exhaust her administrative remedies by first pursuing her termination claim before an ALJ. *Id.* The district court agreed and granted summary judgment on the termination claim in favor of the employer. *Id.* at 807.

The Sixth Circuit reversed on that issue. Notably, it agreed that the plaintiff was required to exhaust her administrative remedies before the ALJ, and her failure to do so deprived the district court of jurisdiction to review her termination claim. *Id.* at 811. But the Sixth Circuit explained that "the special factual circumstances of this case and the applicable principles of equity require that Valentine-Johnson's termination claim be heard in the district court." *Id.* The Court noted that the employer had taken a clearly inconsistent opinion and the ALJ had "adopted and indeed advanced" the employer's position "to the detriment of Valentine-Johnson." *Id.* at 812. Judicial estoppel was therefore necessary to prevent the employer from "abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Id.* (quoting *Teledyne*, 911 F.2d at 1218) (internal quotation marks omitted).

This case is like *Valentine-Johnson*. There, the defendant successfully argued that jurisdiction was appropriate in the federal district court, then later argued before that court that it lacked jurisdiction because the claims should have first been heard before the ALJ. Here, Sprint insisted that the PSC possessed the jurisdiction necessary to resolve the parties' dispute, which it characterized as arising only under state law and the state tariff. Now, in a 180-degree about-face, it argues that the PSC never possessed the jurisdiction necessary to resolve the issues raised

by Sprint, which include claims of federal preemption and require interpretation of the federal tariff. Sprint's insistence that those federal issues ripened only after the state courts ruled against Sprint is flatly unavailing, as explained above.

Accordingly, the Court finds that Sprint took a clearly inconsistent legal position regarding the subject matter jurisdiction of the PSC and such inconsistent legal positions are sufficient to trigger judicial estoppel. This first element is therefore satisfied.

### b.  Acceptance of the Earlier Position

Having determined that Sprint presented inconsistent positions to the Court, the Court next considers whether it was persuaded to accept Sprint's arguments regarding the scope of this legal dispute and the PSC's subject matter jurisdiction. In response to those arguments, this Court expressly held that the PSC did not have *exclusive* jurisdiction over Brandenburg's collection claims. [R. 25, pp. 3–5]. However, in doing so, the Court did *not* find that the PSC lacked the authority to resolve the underlying legal issues in this case. Instead, the Court noted that the PSC lacks the authority to award *damages. See, e.g.*, *id.* at 5. In fact, the Court repeatedly cited to the PSC's inability to grant damages, while also acknowledging the PSC's limited jurisdiction "'over the regulation of rates and service of utilities' in Kentucky." *Id.* at 3 (quoting KSR § 278.010(3)). Then, when evaluating Sprint's arguments for a stay, the Court noted that "Sprint argues[] [that] a final determination from the PSC would simplify the issues in order for the Court *to determine what amount may be collected*." *Id.* at 8 (emphasis added). The Court adopted this argument and ultimately issued a stay, explaining that "[a]lthough the PSC does not have jurisdiction over a damages claim, a resolution of the issues currently pending before the PSC will both simplify the proceedings, as well as aid the Court in its final determination." *Id.* at 9. The Court also noted that a hearing had already been held before the PSC and "the only

- 55 -

remaining action is the issuance of a final order" by that agency, so the harm to Brandenburg in staying the case was minimal. *Id.* at 9–10. Clearly then, the Court adopted Sprint's arguments that the underlying legal dispute involved only matters of state law and state tariff and that these issues could be fully resolved by the PSC, leaving only damages for this Court to determine.[32] As a direct result of these assertions by Sprint, the Court issued a stay in this case. *Id.* at 10.

The Court therefore finds that Sprint "succeeded in persuading [this] court to accept [its] earlier position" regarding the state-law nature of this dispute and the PSC's ability to fully resolve that dispute. *Shufeldt*, 855 F. App'x at 243 (quoting *New Hampshire*, 532 U.S. at 750–51). Accordingly, the second element is satisfied.

### c.  Unfair Advantage

The third factor to be considered is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting *New Hampshire*, 532 U.S. at 750–51). There can be no question that Sprint would derive an unfair advantage if allowed to assert its inconsistent position and proceed with its federal preemption claims in this Court. Sprint would essentially be allowed to squat on its federal claims then assert those federal claims—over a decade later—after receiving an unfavorable ruling in the state proceeding. It would be the quintessential second bite at the apple. Between bites, Sprint has been wrongfully withholding the alleged overcharged amounts, to Brandenburg's detriment and in contravention of proper procedures, as outlined in more detail below. *See infra* Section III(B)(4). This is certainly an unfair advantage. *See Han v. Hankook Tire Co., Ltd.*, 799 F. App'x 347, 350 (6th Cir. 2020) (finding that the plaintiff would gain an

---

[32] There is certainly an argument that the PSC also adopted Sprint's position that the underlying claims revolved around state law. As noted above, Sprint was able to amend its Administrative Complaint, dating its overcharge claims back to 2002, after insisting to the PSC that it sought review only under state law. *See* [R. 101-12, pp. 4–5].

unfair advantage if permitted to pursue a second lawsuit against the defendant, after making certain representations in a prior lawsuit that ultimately resulted in that first suit being dismissed for lack of subject matter jurisdiction).

Sprint made a deliberate and strategic decision to forgo its federal concerns and ultimately pursue only state law claims before the PSC. In the end, Sprint did not receive the result it wanted from the state proceeding. Sprint now wishes to switch forums and pursue the federal claims. To consider Sprint's federal preemption arguments now—issues that have been in play since the filing of Sprint's Administrative Complaint—would present an unfair advantage to Sprint and work an unfair detriment on Brandenburg. This third element is therefore satisfied.

### d. Additional Considerations

In addition to the three factors outlined above, the Court may also look to "additional considerations . . . in specific factual contexts." *New Hampshire*, 532 U.S. at 751. In fact, the Court should "consider all of the circumstances in evaluating whether [Sprint's] inconsistent statements justify estopping the [Sprint] from pursuing [its federal preemption] claims." *Thompson*, 725 F.Supp.2d at 710. For example, the Court should consider whether the inconsistent opinions resulted from mere mistake. As the Sixth Circuit has explained, judicial estoppel "only applies when the positions at issue are clearly contradictory and the estopped party's conduct involves more than mistake or inadvertence." *Shufeldt*, 855 F. App'x at 243 (quoting *Audio Technica*, 963 F.3d at 575) (internal quotation marks omitted). To that end, judicial estoppel should be invoked only "to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (quoting *Teledyne Indus., Inc.*, 911 F.2d at 1218). The Sixth Circuit has described such "cynical gamesmanship" as "the perversion of the judicial

machinery," "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," and "hav[ing] [one's] cake and eat[ing] it too." *Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988).

Here, the Court cannot ignore Sprint's cynical gamesmanship. As the Court has explained in detail above, Sprint first brought its complaints to the PSC and asked the PSC to determine whether Brandenburg was improperly billing interstate calls at intrastate rates, in violation of state *and* federal law, a clear recognition of the swirling federal issues. *See* [R. 9-3 (Administrative Complaint)]. So why did Sprint pivot and frame the issues as being centered only on the state tariff? To avoid the two-year federal limitations period, which, at the time Sprint filed its Administrative Complaint in 2008, would have barred recovery for most of the challenged calls (dating back to 2002). *See infra* Section III(B)(4); *see also* [R. 101, p. 14].

Sprint's attempts to dodge the federal statute of limitations are apparent on the face of the record. Brandenburg notes that in July 2009 Sprint filed a motion to amend its Administrative Complaint to adjust the refund date back to 2002. *See* [R. 101, p. 14]; [R. 101-5 (Amendment to Administrative Complaint)]. Brandenburg objected, arguing that any such claims would be untimely under 47 U.S.C. § 415(c), which provides a two-year statute of limitations for recovery of overcharges. *Id.*; *see also* 47 U.S.C. § 415(c). In response, Sprint argued that the federal statute of limitations did *not* apply because its claims were brought under state law. *See* [R. 101-12, pp. 4–5]. Sprint unequivocally stated:

> 47 U.S.C. § 415(c), the federal statute of limitations cited by Brandenburg, might apply to an overcharge complaint filed at the Federal Communications Commission but it most certainly does not apply to Sprint's claims before the Commission. *Sprint's claims that Brandenburg has violated its own state tariff arise under state law.*

*Id.* Sprint continued, "If there is any statute of limitations that applies—a point that Sprint does not concede—at worst it is the five year (sic) statute of limitations provided by KRS 413.120(2)."[33] *Id.* at 4. These arguments were apparently successful, as the PSC allowed Sprint to amend its Administrative Complaint to include overcharges dating back to 2002. *See* [R. 101-5 (Amendment to Administrative Complaint)]. As Sprint flatly acknowledged at the time, had it pursued its overcharge claims under *federal* law, its claims would have been limited to the two-year statute of limitations under § 415(c).

The point is, when confronted by a much shorter statute of limitations under federal law, Sprint pivoted, insisting to the PSC that it only sought relief under state law. [R. 101-12, pp. 4–5]. Given the apparent difference between the state and federal limitations periods, and Sprint's initial pleading of both state and federal law, there can be little doubt that Sprint's pivot to state law and the state tariff was a tactical decision, not mere mistake or inadvertence.

Sprint similarly represented to this Court that the underlying legal disputes could be resolved on state grounds and insisted that the PSC possessed the authority to resolve those issues. [R. 9, pp. 5–7]. As a direct result of these arguments, this Court issued a stay pending resolution of the PSC proceedings. [R. 25]. However, when the state courts did not affirm the PSC's ruling in full as Sprint had hoped, and when it became clear that the PSC's favorable ruling would not apply retroactively, Sprint sought a do-over in this Court over a decade later, arguing that federal intervention was necessary to prevent encroachment on federal law. [R. 97 (Amended Counterclaims)]. In doing so, Sprint argues that the PSC never possessed authority to interpret the federal tariff, but that such interpretation is necessary to resolve the parties' dispute. *See, e.g.*, [R. 105, p. 21]. Meanwhile, this case had been stayed on the Court's docket for over

---

[33] KRS § 413.120(2) provides a five-year limitations period for "[a]n action upon a liability created by statute, when no other time is fixed by the statute creating the liability."

ten years. During that time, or even earlier, Sprint could have sought relief on its federal issues from the FCC. *See LDDS Communications, Inc. v. United Telephone of Florida*, 15 F.C.C.R. 4950 (2000) (citing 47 U.S.C. §§ 151, 201, 203). Sprint instead made a deliberate and calculated choice to pursue its claims under state law, disavowing the federal claims made in its Administrative Complaint, and hoping for a more favorable resolution in a state proceeding where the longer look-back period would work in its favor.[34]

And still, Sprint deflects from this conduct by arguing that its federal preemption concerns were not triggered until *after* the state courts ruled that the PSC's ruling applied only prospectively. But the pleadings in the state proceeding make clear that Sprint was always well aware of the federal issues in this case. *See, e.g.*, [R. 9-3 (Administrative Complaint); R. 101-7 (Sprint's 2012 Appellate Brief); R. 101-10 (Sprint's 2017 Appellate Brief)]. Its decision to forgo those federal concerns and have its claims heard in a state proceeding was clearly a calculated attempt to proceed under a more forgiving statute of limitations.

The Court cannot ignore such intentional forum shopping and position-shifting. After urging this Court to dismiss or stay because "[t]he PSC has full authority to interpret Brandenburg's intrastate tariff and *thereby resolve the issues that separate the parties*," [R. 14, p. 6 (emphasis added)], thereby triggering a decade-long stay, Sprint now argues federal law preempts the state court outcome. The special factual and procedural circumstances of this case, in addition to the basic principles of equity, prohibit Sprint from now raising federal preemption arguments to this Court. *See generally Valentine-Johnson*, 386 F.3d at 811. Such a result is necessary to prevent Sprint from "abusing the judicial process through cynical gamesmanship,

---

[34] On this point, the Court does not need to find that the state statute of limitations would have allowed for a five-year look-back period, as Sprint argued to the PSC; instead, what is important is Sprint's own belief (and argument to the PSC) that it was entitled to a longer statute of limitations under state law.

achieving success on one position, then arguing the opposition to suit an exigency of the moment." *Id.* at 812 (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)) (internal quotation marks omitted). The Court therefore finds that, even if *Rooker-Feldman*, collateral estoppel, and res judicata do not apply in this case, the doctrine of judicial estoppel bars consideration of Sprint's preemption arguments, whether in the form of a counterclaim or an affirmative defense.

### 4.  Timeliness of Sprint's Preemption Counterclaims and Defenses

There is another reason why Sprint's claims fail. The same two-year statute of limitations Sprint sought to avoid by litigating before the PSC dooms its federal counterclaims in this action. *See* [R. 106, pp. 6–9]. Those counterclaims, Brandenburg correctly asserts, are claims for declaratory relief, and as such, they are subject to the same statute of limitations as the "substantive relief on which [they are] based." *Id.* at 6 (quoting *Jair United Inc. v. Inertial Airline Servs.*, No. 3:12-CV-799-H, 2013 WL 4048539, at *5 (W.D. Ky. Aug. 8, 2013)) (internal quotation marks omitted); *see also Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997) ("A request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred."). According to Brandenburg, the substantive claims on which Sprint's declaratory judgment claims are based are essentially claims for overcharges under the federal Communications Act. *Id.* at 6–7. That Act provides a two-year statute of limitations for recovery of overcharges. *See* 47 U.S.C. § 415(c). Specifically, § 415(c) provides, "For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time

the cause of action accrues, and not after, subject to" certain exceptions not applicable here.[35] *Id.* The term "overcharges" is defined as "charges for services in excess of those applicable thereto under the schedules of charges lawfully on file with the Commission." *Id.* at 415(g). Because Sprint's counterclaims, filed in 2020, seek to recover overbilled amounts from January 2002 to November 2009, [R. 97], Brandenburg argues that those claims are time-barred under § 415. [R. 106, pp. 6–9].

     As an initial matter, the Court notes that Sprint offers no direct response to Brandenburg's argument that Sprint's claims for declaratory relief are governed by the two-year statute of limitations applicable to federal overcharge claims. Sprint simply argues the federal statute is inapplicable (for several meritless reasons discussed below). However, while Sprint acknowledges its counterclaims are based on federal preemption, it provides no explanation for what limitations period *does* apply if § 415(c) is inapplicable. Ostensibly, Sprint believes its federal preemption counterclaims are unburdened by any limitations period, a clearly meritless position.

     Turning to Sprint's other arguments, Sprint acknowledges the two-year statute of limitations under § 415(c) but argues that it is irrelevant for two reasons. First, Sprint insists that "Brandenburg's overbilling of *intrastate* charges created a *state law* remedy, not a right to obtain damages under federal law." [R. 108, p. 12 (emphasis added)]. Thus, Sprint argues, it "never had a claim to recover *interstate* overcharges," and § 415(c) is therefore irrelevant. *Id.* (emphasis added). Next, Sprint notes that § 415(c) applies only to claims seeking to recover *repayment* for overcharges. [R. 108, p. 12]. "But," Sprint asserts, it "has never asserted a claim seeking

---

[35] This provision references complaints filed with the FCC; however, courts have uniformly interpreted it to apply to actions filed in federal district court, as well. *See, e.g., Pavlak v. Church,* 727 F.2d 1425 (9th Cir.1984); *Ward v. Northern Ohio Tel. Co.,* 251 F.Supp. 606 (N.D. Ohio 1966), *aff'd,* 381 F.2d 16 (6th Cir.1967).

*repayment* of interstate overcharges billed and collected." *Id.* Instead, "Sprint seeks a declaration that federal law preempts the enforcement of Brandenburg's state Duo [County] Tariff, as interpreted by the Kentucky state courts, to recover damages." *Id.* And even if § 415(c) applied, Sprint argues, it should not be penalized for the stay issued in 2010, which Brandenburg had specifically requested in light of the state court appeals. *See* [R. 54]. Lastly, Sprint contends that the Communication Act's time limitation does not "prevent Sprint from invoking federal law as a defense to a state tariff enforcement action." *Id.*

The Court first addresses Sprint's specious argument that "Brandenburg's overbilling of intrastate charges created a *state law remedy*, not a right to obtain damages under *federal law*." [R. 108, p. 12 (emphasis added)]. Taking Sprint at its word, the state court decision in favor of Brandenburg conclusively decides this matter, leaving this Court to wonder why it has spent an extraordinary amount of time and spilled ink considering Sprint's counterclaims. Regardless, Sprint's Amended Answer and Counterclaims, [R. 97], belie its own argument. Sprint's quest for declaratory relief is based on *federal law* and enforcing the *federal tariff*:

> Charges for the delivery of interstate long distance services are controlled by the FCC, governed by the terms of the interstate tariffs (like the NECA tariff, in this instance), and not governed by state law. . . . For calls like those at issue, federal law dictates ... [their jurisdictional nature].

*Id.* at 13, ¶ 25. Clearly then, this dispute is not limited to state law.

Turning next to Sprint's argument that it is not seeking *repayment* of interstate charges, but rather a declaration that federal law preempts enforcement of the state court outcome, the Court finds this argument equally meritless. To address this argument, the Court must first take a closer look at what an overcharge action typically entails and the precise nature of Sprint's preemption counterclaims. When a carrier charges an allegedly improper rate, the billed party "should first pay, under protest, the amount allegedly due and then seek redress if such amount

was not proper under the carrier's applicable tariffed charges and regulations." *In the Matter of Business WATS, Inc.*, 7 F.C.C. Rcd. 7942, 7942 (1992) (citation omitted); *see also In the Matter of MCI Telecommunications Corp. Am. Tel. & Tel. Co. & the Pac. Tel. & Tel. Co.*, 62 F.C.C.2d 703, 705–06 (1976) (explaining that "MCI's self-help approach is contrary to Section 203 of the Communications act of 1934, as amended, and existing case law" and noting that "self-help is not an acceptable remedy"). The billed party "is not entitled to the self-help measure of withholding payment for tariffed services duly performed."[36] *In the Matter of Business WATS, Inc.*, 7 F.C.C. Rcd. at 7942. This should come as no surprise to Sprint. *See Centurytel of Chatham, LLC v. Sprint Communications Co., L.P.*, 185 F.Supp.2d 932, 946 (W.D. La. 2016) (finding that Sprint violated § 201(b) of the Communications Act by "unjustly and unreasonably [withholding] payments due to CenturyLink to reduce its retroactive refund claim"). In the present case, Sprint does not dispute that it withheld payments to Brandenburg from March of 2008 through January of 2011. [R. 97, ¶ 93].

Turning to Sprint's claims, the Court agrees that the preemption counterclaims (Counts I–III) do *not* raise typical overcharge claims. For instance, Sprint's Prayer for Relief does *not* include a claim for overcharges but instead seeks to prevent Brandenburg from recovering on its claim for damages and requests penalty interest under the state tariff. *Id.* at p. 25. Similarly, Sprint's fourth counterclaim is for penalty interest. In that counterclaim, Sprint alleges that "Brandenburg overbilled Sprint intrastate access charges." *Id.* ¶ 88. Sprint further alleges that it paid Brandenburg for those invoices issued from January 1, 2022 through October 2007. *Id.* ¶ 90. However, Sprint then alleges that, "[b]etween March of 2008 and January of 2011, Sprint

---

[36] Sprint argued to the PSC that it was entitled under *state* law and the *state* tariff to withhold disputed amounts. [R. 9-9 (Sprint's Response to Emergency Motion)]. Sprint has not made that argument to this Court, nor is it relevant to the Court's analysis. However, to be clear, the Court is not aware of any authority—state or federal—that authorizes Sprint to withhold payments to recoup for prior alleged overcharges.

recovered the principal amounts of these overpayments." *Id.* ¶ 93. The Court understands that Sprint "recovered the principal amounts of these overpayments" by refusing to pay Brandenburg's subsequent invoices. *See, e.g.*, [R. 105, p. 11]; [R. 9-9, pp. 7–8]. Sprint's fourth counterclaim then goes on to raise a claim for penalty interest (but not overcharges) under the terms of the Duo County tariff. Sprint's fifth counterclaim similarly invokes the federal filed rate doctrine and argues that federal law prevails over the state tariff, and as a result, "Brandenburg is obligated to pay Sprint penalty interest and the appropriate rate under the Duo [County] Tariff." *Id.* ¶¶ 96–102. From this, the Court understands that none of Sprint's counterclaims seek damages for overcharges, but instead, the three preemption counterclaims (Counts I–III) seek declaratory relief and the remaining counterclaims (Counts IV–V) seek penalty interest under the Duo County tariff. In doing so, these counterclaims seek generally to prevent Brandenburg from recovering the amounts Sprint withheld.

Even so, claims for declaratory relief are typically subject to the same statute of limitations applicable to their underlying substantive claims. *Int'l Ass'n of Machinists & Aerospace Workers*, 108 F.3d at 668. This rule applies when the claim for equitable relief (e.g., a claim for declaratory relief) "is pursued to vindicate a legal right." *Algonquin Gas Transmission, LLC v. Weymouth,* Massachusetts, 919 F.3d 54, 61 (1st Cir. 2019). "For example, federal law may create a legal right subject to enforcement at both law (for damages) and equity. In such a case, the limitations period applicable to the claim at law may be applied to the equitable claim as well." *Id.* (citing *Cope v. Anderson*, 331 U.S. 461, 464 (1947); *Russell v. Todd*, 309 U.S. 280, 287 (1940)). In other words, where there is a "concurrent claim at law," that law's statute of limitations applies to the claim for equitable relief. *Id.* A claim is "'concurrent' when 'the only difference between [the legal claim and the equitable claim] is the relief sought.'" *Id.* (quoting

*Grynburg v. Total S.A.*, 538 F.3d 1336, 1353 (10th Cir. 2008)). In such cases, the legal claim's statute of limitations may bar the claim for equitable relief. This "concurrent-legal-remedy doctrine . . . 'prevent[s] plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labelling.'" *Id.* (quoting *Gilbert v. City of Cambridge*, 932 F.2d 51, 57 (1st Cir. 1991)).The Sixth Circuit and its district courts have applied this "concurrent-legal-remedy doctrine" to bar equitable relief. *Madison v. Wood*, 410 F.2d 564, 567–68 (6th Cir. 1969); *Mayes v. Kentucky Parole Bd.*, No. 3: 18-CV-32-GFVT, 2018 WL 3594971, at *3 (E.D. Ky. July 26, 2018); *Sierra Club v. DTE Energy Co.*, No. 13–CV–11103, 2013 WL 6910431, *5 (E.D. Mich. Oct. 7, 2013).

At its core, this case involves a dispute over whether Brandenburg overcharged Sprint for long distance calls. The effect of Sprint's claim for declaratory relief, if granted, would be to categorize the disputed calls as interstate under the PIU method, apply the federal tariff's lower rates, and block Brandenburg's damages claims (which are based on application of the CPN method to characterize the calls as intrastate). In other words, Sprint is arguing that the damages sought by Brandenburg—which are based on the CPN method—exceed the amount that it should be able to claim because it should have been using the PIU method as required by federal law. In a nutshell, the basis for this claim is that Brandenburg's use of the CPN method improperly characterizes factually interstate calls as intrastate calls, thereby allowing Brandenburg to charge the higher intrastate access charge. The question becomes, is there a concurrent legal claim that would have allowed Sprint to pursue this theory? There was.

Had Sprint followed proper procedures, it could have sought relief via an overcharge claim under the Communications Act. *See* 47 U.S.C. § 415(c); *In the Matter of Business WATS, Inc.*, 7 F.C.C. Rc.d at 7942 (explaining that the billed party "should first pay, under protest, the

amount allegedly due and then seek redress if such amount was not proper under the carrier's applicable tariffed charges and regulations"). The Act allows an overcharged client to bring an overcharge action within two years of its accrual. *See* 47 U.S.C. § 415(c). Most circuits have held that a cause of action accrues under § 415 "either when a readily discoverable injury occurs or, if an injury is not readily discoverable, when the plaintiff should have discovered it." *Communications Vending Corp. of Arizona, Inc. v. F.C.C.*, 365 F.3d 1064, 1074 (D.C. Cir. 2004) (citation omitted). Thus, the FCC has explained that "[i]n cases involving allegations that a carrier has failed to charge a just and reasonable rate. . . , the general rule is that the two-year limitations period begins to run when the customer receives a bill from the carrier assessing the disputed rate." *Id.* at 1073 (quoting *In re MCI Telecomms. Corp. v. U.S. West Communications, Inc.*, 15 F.C.C.r. 9382, 9330 (2000)) (internal quotation marks omitted).

Sprint's Amended Counterclaims, filed on July 31, 2020, seek a declaration that it was improperly billed the higher intrastate rate for factually interstate calls from January 2002 through November 2009. The overcharge actions for those claims accrued on the dates that Sprint received its bills from Brandenburg. From approximately January 2002 through February 2008, Sprint paid those bills, but never pursued an overcharge claim under the Communications Act. So while it is true that Sprint is not asserting a damages claim for *repayment* under federal law, that is simply because Sprint improperly availed itself to self-help recoupment and withheld payment to Brandenburg for services provided and billed between March 2008 and January 2011. [R. 97, p. 20, ¶ 69 ("Between March of 2008 and January of 2011, Sprint recovered the principal amount of its disputes by applying approved invoice amounts to reduce the debit balance on Sprint's books. . . .")]; [R. 9-9, ¶ 9 (explaining "the process whereby Sprint has established a debit balance associated with the payable account for Brandenburg to reflect the

unlawful charges Brandenburg has levied against and collected from Sprint over an extended period of time")]. But avoiding a claim for overcharges (a legal remedy) through intentional self-help recoupment does not mean Sprint had an unlimited time period in which to pursue its equitable remedies for declaratory relief. Stated another way, Sprint cannot intentionally deprive itself of its legal remedy (damages) by declining to file a timely overcharge suit, recoup the allegedly overcharged amounts by withholding later payments, and then claim there is no time limitation for its equitable claim of declaratory relief. Instead, Sprint remains bound by the statute of limitations applicable to the concurrent legal remedy available under the Communications Act. As such, Sprint was required to bring its claims, whether legal or equitable, within two years of the disputed bills; however, it first brought its claims for declaratory relief in 2020, nearly eleven years after the last alleged overcharges ending in November 2009.

Notably, Sprint could have timely raised its federal claims with the F.C.C. On this point, Sprint argues that any attempt to seek relief from the FCC would have been futile.[37] First, it argues that "a complaint [with the FCC] would have been dismissed," [R. 105, p. 21 n.10], citing *LDDS Communications, Inc.* In that case, the FCC found that it lacked jurisdiction to consider the plaintiff's claim regarding its liability for *intrastate* access services. 15 F.C.C.R. at 4955. However, it noted that it "unquestionably would have the authority to decide issues arising under United's federal tariff." *Id.*; *see also McClure Telephone Co. v. AT&T Communications of Ohio, Inc.*, 650 F. Supp.2d 699, 708 (N.D. Ohio 2009). Here, Sprint has made clear that it asks this Court to interpret the federal tariff and conduct a preemption analysis. *See, e.g.*, [R. 105, p. 5–8]. At the heart of that issue is Sprint's claim, first asserted before the PSC, that Brandenburg's use

---

[37] Sprint makes this argument in response to Brandenburg's judicial estoppel argument. Nevertheless, the Court finds it relevant to this statute of limitations analysis.

of the CPN method conflicts with the terms of the federal tariff and federal law. Sprint offers no

reason as to why the FCC would have declined jurisdiction over *that* issue. Further, Sprint

acknowledges that it could have filed a petition for declaratory relief under 47 C.F.R. § 1.2,

[R. 105, p. 21 n.10], which allows the FCC to "issue a declaratory ruling terminating a

controversy or removing uncertainty." *See* 47 C.F.R. § 1.2(a). To explain why it failed to file

such a petition, Sprint notes only that "the FCC has no obligation to rule on such petitions."

[R. 105, p. 21 n.10]. Sprint offers no reason as to why the FCC would have declined to rule on

such a petition in this case, however. The Court therefore finds that Sprint could have disputed

Brandenburg's use of the CPN method as early as January 2002.

On this point, the Court feels compelled to cite from the PSC's November 2009 Order. In

a section describing Sprint's arguments to the PSC, the PSC stated,

> Sprint claims that Brandenburg relies solely on the originating and terminating
> CPNs rather than properly considering the geographic location of the calling party
> to determine the jurisdiction of calls being terminated. *Sprint alleges that it became
> aware of similar nationwide problems in the late 1990s and has been addressing
> the problem by prioritizing based on Sprint's financial exposure with each carrier.*
> Sprint claims that it began negotiating with Brandenburg in November 2007 and
> estimates that, over the years, it has been significantly overpaying Brandenburg.

[R. 92-2, p. 2–3 (emphasis added)]. Clearly, Sprint understood that reliance on the CPN method

created a billing issue as early as the 1990s, but instead of immediately seeking action against

Brandenburg, it chose to prioritize other claims based on its financial exposure with those

carriers. Apparently, Sprint's financial exposure with Brandenburg was limited enough that it felt

it could wait until 2020 to raise its federal claims, which relate to Brandenburg's use of the CPN

method in 2002–2009. True, Sprint filed a claim before the PSC in 2008 and alluded to those

federal conflicts, but Sprint insists that it has always understood that the PSC had the authority to

consider only its claims relating to *intrastate* communications and the state tariff. *See, e.g.*,

[R. 105, pp. 12, 14]. Taking Sprint at its word, it is clear that Sprint understood there was a conflict between federal law and Brandenburg's use of the CPN method, but it sat on its rights and failed to raise any federal claims until 2020. Though Sprint now attempts to argue that the state court rulings, which became final in 2020, are the catalyst behind its federal claims, *see, e.g.*, [R. 108, p. 13], the Court finds this argument to be nothing more than artful (and disingenuous) pleading. As the Court has already explained, a closer look at Sprint's Administrative Complaint and its Amended Counterclaims in this Court reveal nearly identical arguments. Thus, when Sprint raised its state claims to the PSC, it clearly understood there was a potential federal conflict, as well. Yet, without explanation, Sprint did not seek relief on those claims in an appropriate forum until 2020.

Next, Sprint argues that it "cannot logically be penalized because Brandenburg successfully moved for a stay [in 2010]." [R. 108, p. 13]. But Sprint's own delay in bringing its claims rendered those claims untimely by 2010. Further, nothing prevented Sprint from asserting its federal preemption counterclaims at any point before the stay was issued in 2010. And more importantly, Sprint's argument ignores the procedural posture of this case. It was *Sprint* that first asked this Court to stay these proceedings pending outcome of the PSC case, [R. 9], and it was *Sprint's* representations about the state-law nature of its claims that convinced this Court to enter that stay. *See* [R. 25]; *supra* Section III(B)(3)(b). The Court ultimately stayed the case until the PSC issued a final decision. [R. 25, p. 10 ("This case shall be stayed until the Kentucky Public Service Commission has issued a final decision in Case No. 2008-00135.")]. Exactly one day after the PSC's favorable decision became final,[38] Sprint notified this Court that it considered the

---

[38] In a December 16, 2009 letter to this Court, Sprint's counsel represented that Brandenburg had filed a petition for rehearing of the PSC's November 6, 2009 decision, and the PSC denied that request on December 15, 2009. [R. 27]. Sprint's counsel thus stated, "The Commission's decision was now final. Accordingly, Spring is answering Brandenburg Telephone Company's complaint and filling counterclaims." *Id.*

stay lifted, and it would therefore be filing an answer and counterclaims. [R. 27 (Letter from Sprint's counsel)]. In response, Brandenburg moved this Court to continue the stay—which had been previously imposed in 2009 at Sprint's request—citing the ongoing appeal of the PSC's decision in state court, the proper venue to challenge the PSC's decision. [R. 34, pp. 17–21]. The Court is therefore at a loss as to how the decade-long stay excuses Sprint's tardy counterclaims.

Finally, without citing any case law or statutory authority, Sprint argues that it should not "be penalized when it timely pled defenses to a damages enforcement case that could only be adjudicated by this Court." [R. 108, p. 13]. The Court is unclear what Sprint even means by this statement. At best, it is a wholly undeveloped argument, and the Court considers it waived. *See Slater v. Potter*, 28 F. App'x 512, 513 (6th Cir. 2002) (indicating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (citation omitted)); *Salmon v. Old Nat'l Bank*, No. 4:08–CV–00116–JHM, 2012 WL 4213643, at *16 (W.D. Ky. Sept. 19, 2012) ("[S]ince Defendant has failed to support its argument with any legal authority, the Court deems its argument waived."); *Singleton v. Astrue*, 2010 WL 6004448, at *3 (E.D. Ky. June 28, 2010) ("It is well-established that courts '[are] not obligated to consider unsupported arguments inadequately developed in the briefs.'" (quoting *Lewless v. Sec'y of Health and Hum. Servs.*, 19994 WL 201887, at *4 (6th Cir. May 23, 1994))).

Moreover, to the extent this is Sprint's attempt to argue that it timely filed a preemption defense at the earliest possible time, this argument fails. Brandenburg's damages claim was first asserted *before the PSC* as a counterclaim in 2008, and Sprint filed no federal preemption defense in response, nor did it seek guidance from the FCC or a state or federal court. *See* [92-2, p. 1]. But Sprint clearly understood back in 2008 when it filed its Administrative Complaint that there was a potential conflict between federal law and Brandenburg's use of the CPN method.

*See* [R. 9-3 (Administrative Complaint)]. Nevertheless, Sprint made the calculated decision to pursue state law claims through the PSC, undoubtedly to side-step the two-year federal limitations period.

Though Sprint now argues that the state court rulings, which became final in 2020, are the catalyst behind its federal claims, *see, e.g.*, [R. 108, p. 13], the Court finds this argument to be nothing more than artful (and disingenuous) pleading. As the Court has already explained, a closer look at Sprint's Administrative Complaint and its Amended Counterclaims in this Court reveals nearly identical arguments. Thus, when Sprint raised its state claims to the PSC, it clearly understood there was a potential federal conflict, as well. Sprint sat on its federal claims, likely because by 2008, when it filed its PSC action, most of the alleged overpayments (dating from 2002), were already time-barred under the federal statute. Accordingly, for the reasons stated above, the Court finds that Sprint's preemption counterclaims are time-barred under § 415. This application of the concurrent-legal theory doctrine is necessary to prevent Sprint "from making a mockery of the statute of limitations by the simple expedient of creative labelling.'" *Algonquin Gas Transmission, LLC*, 919 F.3d at 61 (quoting *Gilbert*, 932 F.2d at 57).

This analysis applies with equal force to Sprint's affirmative defense of federal preemption. Generally, affirmative defenses are not subject to statutory limitations periods. *See Heartland Materials, Inc. v. Warren Paving, Inc.*, No. 5:16-cv-00146-TBR, 2018 WL 2324075 (W.D. Ky. May 22, 2018). Nevertheless, under certain circumstances, a party may be prohibited from asserting such affirmative defenses in an attempt to "sidestep the temporal bar to [its] claims." *Id.* at *7 (quoting *City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1035–36 (9th Cir. 2003)) (internal quotation marks omitted). Multiple court have recognized such a rule. *Id.* at *6; *City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1031 (9th Cir. 2003); *Davis v. 24 Hour*

*Fitness Worldwide, Inc.*, 75 F.Supp.3d 635, 639 (D. Del. 2014). And this Court has similarly prohibited parties "from skirting statute of limitations by bringing time-barred claims as affirmative defenses." *Heartland Materials, Inc.*, 2018 WL 2324075, at *6; *see also Garza v. Everly*, No. 21-5530, 2023 WL 1873339, at *4–5 (6th Cir. Feb. 10, 2023).[39]

In doing so, the Court emphasized "the respective roles of the parties in the litigation as a whole." *Id.* (quoting *Evans*, 344 F.3d at 1031). The Court explained,

> Specifically, "[i]t is important that the party asserting the defense is not, simultaneously or in parallel litigation, seeking affirmative recovery on an identical claim. Thus, whether affirmative defenses are exempt from statutes of limitations largely hinges on a realistic assessment of the parties' litigation posture." [*Evans*, 344 F.3d 102 at 1035]. "In other words, a plaintiff cannot engage in a subterfuge to characterize a claim as a defense in order to avoid a temporal bar." *Id.*

*Heartland Materials, Inc.*, 2018 WL 2324075, at *6. Thus, the Court must consider whether the party asserting the untimely affirmative defense is the "aggressor," or in other words, the party who "disturbed the equilibrium between the parties." *Id.* at *7 (quoting *Evans*, 344 F.3d at 1035). For example, in *Heartland Materials, Inc.*, the defendants, Warren Paving, had previously filed suit asserting certain causes of action against Heartland Materials, but those claims were dismissed as time-barred. *Id.* at *3. After the dismissal of those claims, Warren Paving, Inc. refused to make any further royalty payments to Heartland Materials. *Id.* at *4. As a result, Heartland Materials, Inc. was forced to file suit against Warren Paving, Inc., at which point Warrant Paving attempted to assert affirmative defenses that mirrored its earlier time-barred claims. *Id.* at *4–6. The Court found this to be inappropriate. The Court explained that, by

---

[39] In *Heartland*, the Court also concluded that the defenses were barred by res judicata. 2018 WL 2324075, at *9. The Sixth Circuit affirmed the Court's res judicata analysis and therefore did not need to consider the statute of limitations analysis. *See Heartland Materials, Inc. v. Warren Paving, Inc.*, 819 F. App'x 323, 330 (6th Cir. 2020). However, the Sixth Circuit acknowledged that "[t]he district court's [statute of limitations] analysis is well reasoned and persuasive." *Id.* More recently, in *Garza v. Everly*, the Sixth Circuit, citing to *Evans*, applied a statute of limitations to a defense. *Garza*, 2023 WL 1873339, at *4–5.

refusing to make payments after losing the first lawsuit, Warren Paving had essentially invited the second lawsuit. *Id.* at *7. Under those circumstances, the Court could not allow Warren Paving to "hide behind the maxim applicable to defenses asserted in the normal course nor may [the defendants] sidestep the temporal bar to [their] claims." *Id.* (quoting *Evans*, 344 F.3d at 1035) (internal quotation marks omitted).

The Court finds this analysis to be applicable in the current case. Without question, Sprint is the "aggressor" among the parties. By withholding payments from Brandenburg, Sprint essentially invited this lawsuit, then, after losing in the state proceedings (which Sprint had instigated), Sprint attempted to use this lawsuit as a vehicle for its time-barred preemption claims. Having determined that those counterclaims are untimely, and further recognizing that Sprint is the true aggressor in this case, the Court finds that the statute of limitations also bars Sprint's preemption defenses. To hold otherwise would allow Sprint to perform "a sort of jurisdictional jujitsu[] to evade the limitations statutes." *Id.* at *6 (quoting *Evans*, 344 F.3d at 1031) (internal quotation marks omitted).  The Court therefore finds that § 415(c)'s limitations period bars Sprint's counterclaims, as well as its affirmative defenses.

In sum, the Court finds that, under the concurrent-legal-theory doctrine, Sprint's counterclaims for declaratory relief (Counts I–III) accrued at the time that the disputed bills became due, with the most recent becoming due in 2009. Sprint failed to bring any federal overcharge claims because it had already recouped the disputed amounts by withholding payment to Brandenburg for later services (a practice prohibited under federal law). Sprint failed to bring any claims for declaratory relief until 2020, over a decade after the two-year statute of limitations for overcharge claims expired.[40] This analysis applies with equal force to Sprint's

---

[40] On this point, the Court notes that Sprint expressly disavowed application of any equitable tolling doctrines. [R. 108, p. 12 n.10 (arguing that Brandenburg's discussion of *Drumm v. Sizeler Realty Co.*, 647 F.Supp. 1288 (E.D. La.

affirmative defense of federal preemption, as explained above. The Court therefore finds that the counterclaims for declaratory relief and its federal preemption affirmative defenses are barred by the two-year statute of limitations under § 415(c).

### 5. Sprint's Penalty Interest Counterclaims (Counts IV–V)

The Court's dismissal of Sprint's preemption counterclaims and affirmative defense directly affects the remaining counterclaims (Counts IV–V). As noted previously, Sprint's fourth counterclaim argues that Brandenburg "overbilled Sprint intrastate access charges," [R. 97, ¶ 88], and seeks penalty interest on those overcharged amounts. *Id.* ¶ 95. For support, Sprint cites to Section 2.4.1(E) of the Duo County tariff, which states,

> If the customer pays the total billed amount and disputes all or part of the amount, the Telephone Company will refund any overpayment. In addition, the Telephone Company will pay the customer penalty interest on the overpayment.

*Id.* ¶ 89. The crux of this counterclaim is that Brandenburg overbilled Sprint "from January 1, 2002 through October 2007," *Id.* ¶ 91. However, the state courts have already determined that Brandenburg was permitted to use the CPN method during this time period, and the Court has given preclusive effect to those rulings. *See supra* Section III(B)(2)(a)(i). To the extent that Sprint argues that federal law requires otherwise, the Court has already disposed of those preemption arguments. *See supra* Sections III(B)(2)–(4). There is no other evidence of overcharging during this time period. Accordingly, because Sprint has failed to demonstrate that it overpaid during the January 2002–October 2007 time period, it cannot receive penalty interest under the state tariff.

Similarly, Sprint's fifth counterclaim cites to the filed rate doctrine and argues that Brandenburg "is entitled to compensation allowed by the federal NECA Tariff" for interstate

---

1986) was unnecessary and insisting that "*Drumm* is an irrelevant tolling case, and Sprint did not need to toll a claim under 47 U.S.C. § 415(c) because it is not asserting a claim under that provision")].

communications, "and no more." *Id.* ¶ 98. Sprint also alleges that Brandenburg has failed to comply with the Duo County tariff, and it has failed "to refund amounts it improperly billed and collected between January 1, 2002 and November 2007." *Id.* ¶ 101. "Per the filed rate doctrine," Sprint argues, "Brandenburg is obligated to pay Sprint penalty interest and the appropriate rate under the Duo Tariff." *Id.* ¶ 102. From what the Court can decipher, this fifth counterclaim mirrors the fourth counterclaim. In other words, the fifth counterclaim also alleges that Brandenburg overcharged Sprint from January 1, 2002 through November 2007, and it seeks penalty interest under the Duo County tariff. Thus, for the same reasons that the Court finds Sprint's fourth counterclaim to be without merit, the Court similarly finds the fifth counterclaim to be without merit. Accordingly, the Court will grant summary judgment in favor of Brandenburg on both the fourth and fifth counterclaims.

### 6. Timeliness of Brandenburg's Breach of Contract Claims

Having disposed of each of Sprint's counterclaims and its federal preemption defense, the Court turns to Brandenburg's breach of contract claim. As already discussed, the Court finds that the state proceedings are entitled to preclusive effect to the extent that they hold that, under state law, Brandenburg was permitted to use the CPN method prior to November 2009. And the Court has determined that, to the extent Sprint challenges that ruling under federal law, such claims and defenses are barred. Accordingly, the Court turns to the remaining argument surrounding Brandenburg's breach of contract claim, i.e., whether, or to what extent, it is barred by the applicable statute of limitations.

On this issue, Sprint argues that any claims for interstate charges due after February 3, 2009 are barred by § 415(a). [R. 105, pp. 9–10]. That section provides, "All actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years

from the time the cause of action accrues, and not after." 47 U.S.C. § 415(a). Sprint argues that a carrier's cause of action for nonpayment of invoices accrues at the time the payment becomes past due, meaning thirty days after the invoice is issued. *MFS Int'l, Inc. v. International Telecom Ltd.*, 50 F. Supp.2d 517, 526 (E.D. Va. 1999); *MCI Telecoms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1098, 1100–01 (3rd Cir. 1995). According to Sprint, Brandenburg's claims for charges arising *after* February 3, 2009 (the date Brandenburg initiated this suit) are time-barred because they were raised for the first time in Brandenburg's Amended Complaint in 2020, and they do not "relate back" to the date of the earlier claims. [R. 105, p. 9]. Instead, Sprint argues, each unpaid bill created a new cause of action, and therefore "each bill had to be timely sued out (sic) or else recovery was barred." *Id.* at 10 (citing *MCI Telecoms.*, 71 F.3d at 1101.

In response, Brandenburg argues that § 415, a federal statute of limitations, cannot apply to its claims for *intrastate* charges, as those claims are based in state law (i.e., breach of contract). [R. 107, pp. 9–10]. However, existing authority demonstrates that even state law claims can be governed by § 415's limitations periods. *See MFS Int'l*, 50 F.Supp.2d at 520–23 (holding that § 415(b) applied to carrier's state law breach of contract claim); *Firstcom*, 618 F.Supp.2d at 1005 (finding that § 415(c) applied to state law claims because they fell within the Act's broad definition of claims against carriers for overcharges). On the other hand, other courts have found that certain state claims are *not* subject to § 415, where those claims do not seek to challenge or invalidate a tariff, or do not dispute the reasonableness of the rates or terms contained in any filed tariff. *See Maimonides Medical Center v. Verizon New York Inc.*, No. 09 CV 54 (CBA)(RML), 2010 WL 11627493, at *11 (E.D. N.Y. May 13, 2010).

Neither party addresses this authority. In fact, neither party expends much effort to discuss the statute of limitations applicable to Brandenburg's breach of contract claim.

Nevertheless, the Court finds that, regardless of which statute of limitations applies, state or federal, the claims asserted in Brandenburg's Amended Complaint relate back to its original Complaint, filed in February 2009.

On this point, the Court has reviewed the scant authority cited by Sprint and finds it to be inapplicable here. Sprint relies primarily on *MCI Telecommunications Corp. v. Teleconcepts, Inc.* for the proposition that "each bill for interstate communications is like an installment contract, in that a new cause of action arises from the date each payment is issued." [R. 105, pp. 9–10 (citing *MCI Telecomm. Corp.*, 71 F.3d at 1101)]. True, the Third Circuit in *MCI Telecommunications* held that the causes of action arising under § 415(a) in that case accrued when the payment became past due, which, under the terms of that carrier's tariff, was thirty days after the date of the invoice. *MCI Telecomm. Corp.*, 71 F.3d at 1101. Here, the NECA tariff similarly provides that any amount not paid within approximately one month of the invoice date is considered past due. *See* [R. 105, p. 9 (citing R. 100-1, p. 35)].[41] Thus, Sprint argues, Brandenburg's causes of action accrued on these "past due" dates. *Id.* From this, Sprint seems to suggest that Brandenburg was required to amend its complaint each time a new cause of action accrued, or every time an invoice became past due.

But Sprint's reliance on *MCI Telecommunications Corp.* is misguided. In that case, the carrier filed its complaint on January 15, 1992. *See MCI Telecomm. Corp.*, 71 F.3d at 1101. It attempted to collect on bills dating from November 1989 through March 1990. *Id.* The Court held that the causes of action for three of those bills accrued on December 8, 1989, December 15, 1989, and January 8, 1990, and the two-year statute of limitations for those claims had therefore

---

[41] The provision of the NECA tariff cited by Sprint states, "All bills . . . are due 31 days (payment date) after the bill day or by the next bill date (i.e., same date in the following month as the bill date), whichever is the shortest interval. . . ." [R. 100-1, p. 35].

run prior to the filing of the complaint on January 15, 1992. *Id.* In other words, the statute of limitations had expired before the carrier brought suit. As a result, those claims were time-barred. *Id.* The remaining claims were timely and allowed to proceed. *Id.*

In this case, Brandenburg filed this collection suit on February 3, 2009, seeking to collect $370,976.00 in damages for access charges that Sprint had refused to pay since approximately November 2007 and continued to withhold. [R. 1-3 (State Court Complaint)]. Then, in July 2020, after this case had been stayed for a decade, Brandenburg amended its complaint to include a claim for damages arising from unpaid bills dated November 2007 through February 2011. [R. 92]. Thus, unlike the carrier in *MCI Telecommunications Corp.*, Brandenburg has brought *new* claims—meaning causes of action that had not accrued at the time of the suit's initiation in 2009—in an amended complaint. As a result, this is not a simple question of whether the statute of limitations expired prior to the filing of this suit; rather, the Court must consider whether the new claims in the Amended Complaint relate back to the original complaint. *MCI Telecommunications Corp.* does not address this issue.

On the "relation back" issue, Sprint incredibly argues that "[t]hese new claims do not relate back to the date of its earlier claim because Sprint's alleged failure to pay for services on those later bills does not arise 'out of the conduct, transaction, or occurrence set out . . . in the original pleading.'" [R. 105, p. 9 (quoting Fed. R. Civ. P. 15(c)(1)(A)–(C))]. Sprint's only explanation for this position is that "[t]hose later transactions had not yet occurred when the complaint was filed." *Id.* Other than citing to this excerpt from Rule 15, Sprint fails to cite to any law or authority in support of this argument.

The Court finds Sprint's arguments to be both unsupported and unavailing. Sprint raised similar arguments in 2015 before the United States District Court for the District of South

Dakota. *See Sprint Communications Co. L.P. v. Crow Creek Sioux Tribal Court*, 4:10-CV-04110-KES, 2015 WL 12670415, at *3–5 (D. S.D. June 2, 2015). In that case, Sprint began withholding certain payments from the defendant-carrier and eventually brought suit against the carrier in 2010, alleging violations of the Communications Act and unjust enrichment. *Id.* at *1. The defendant-carrier answered and asserted counterclaims, including a breach of contract claim and a damages claim for Sprint's nonpayment of access charges. *Id.* From November 2011 through mid-2014, the matter was referred to the FCC and the federal lawsuit was stayed. *Id.* at *2.

After the stay was lifted, the defendant-carrier amended its counterclaims to add "a number of allegations that arose during the period of the stay and FCC referral." *Id.* Those allegations of nonpayment arose under the defendant-carrier's most recent tariff, which had been revised in August 2011, after it filed its original counterclaims. *Id.* Sprint sought to dismiss those claims, arguing that they arose under a different tariff and therefore could not relate back to the original counterclaims. *Id.* at *3. The district court disagreed. The court considered the language of Rule 15(c), whether the amended counterclaims related to "the general fact situation alleged in the original pleading," and the lack of unfair surprise or prejudice to Sprint. *Id.* at *4. The Court concluded that the "general fact situation alleged in the original" counterclaims "was that Sprint had refused and is still refusing to pay for the access services that [the defendant-carrier] provides." *Id.* at *5. Thus, Sprint was "on notice that [the defendant-carrier] was seeking recovery of past, present, and future unpaid access fees as they accumulate." *Id.* Further, Sprint had made no showing of unfair surprise or prejudice. *Id.* The district court therefore found that the amended counterclaims related back to the original pleading and, as a result, they were timely. *Id.*

This analysis is highly persuasive. Like that court, this Court first turns to the language of Rule 15(c). That rule provides that an amendment "relates back to the date of the original pleading" so long as "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(B). The Sixth Circuit has provided the following guidance on applying Rule 15(c):

> When applying this standard to the facts of a given case, the Court gives content to those terms not by generic or ideal notions of what constitutes a "conduct, transaction, or occurrence," but instead by asking whether the party asserting the statute of limitations defense had been put on notice that he could be called to answer for the allegations in the amended pleading. *See Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 573 (7th Cir.2006) ("The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one."). The Rule also must be interpreted in light of the "fundamental tenor of the Rules," which "is one of liberality rather than technicality." [*Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000)].

The Sixth Circuit has also explained that "[t]his standard is usually met 'if there is an identity between the amendment and the original complaint with regard to the general wrong suffered and with regard to the general conduct causing such wrong." *Durand v. Hanover Ins. Group, Inc.*, 806 F.3d 367, 375 (6th Cir. 2015) (quoting *Miller*, 231 F.3d at 250). Thus, the standard applied in the Sixth Circuit mirrors that applied in the District of South Dakota case cited above.

Here, the factual allegations in Brandenburg's original Complaint (and its counterclaim before the PSC) put Sprint on notice of the broad nature of Brandenburg's claims, i.e., that Sprint had refused and, at the time, continued to refuse to pay for the switched access charges provided by Brandenburg. *See* [R. 1-3 (State Court Complaint); R. 9-4, pp. 7–10 (PSC Answer and Counterclaims)]. The very fact that Sprint withheld (and continued to withhold) payments formed the basis for Brandenburg's breach of contract and damages claim in this Court and its counterclaim before the PSC. In fact, in early 2009, Sprint argued *against* viewing the dispute on

a bill-by-bill basis and instead urged the PSC to view the dispute as ongoing. In response to Brandenburg's Emergency Motion to Compel Payment of Access Charges, [R. 9-8], Sprint argued that it was entitled to withhold payments on more recent bills in order to offset the amounts overpaid on earlier bills. [R. 9-9, ¶¶ 9–10]. In opposition to Brandenburg's motion, in which Brandenburg argued that Sprint continued to improperly withhold payments, Sprint argued, "Brandenburg seeks to have the [Administrative] Complaint and the dispute viewed as a series of disputes rather than a continuum of a method practice." *Id.* ¶ 20. Instead, Sprint argued, "[t]his is one dispute on a single account for intrastate access charges that Brandenburg seeks to collect from a single company." *Id.* Later in the response, Sprint again argued,

> Brandenburg's position on the nature of the complaint is without merit. Brandenburg seeks to have the complaint and the dispute viewed as a series of disputes (e.g., each new billing period) rather than a continuum of a method of practice and one dispute on a single account for all intrastate access charges that Brandenburg seeks to recover from a single company. Brandenburg wants to wait to address the amount it has overbilled and over-collected at some future point while it collects money for current activity.

*Id.* ¶ 14.  From this, it is unquestionably clear that Sprint was on notice that Brandenburg sought to recover past, present, *and future* unpaid fees "as they accumulate[d]." *Crow Creek Sioux Tribal Court*, 2015 WL 12670415, at *5. Sprint has not argued otherwise, nor has Sprint claimed or even suggested that it would suffer from unfair surprise or prejudice if relation back is permitted. Under these circumstances, the Court finds that the amendment at issue relates back to the filing of the original Complaint.

In sum, the Court finds that, even assuming § 415(a)'s two-year statute of limitations applies, the claims asserted in Brandenburg's Amended Complaint relate back to its original Complaint and are therefore timely.

### 7.  Damages

Having determined that Sprint's counterclaims and preemption defenses fail, and the state court rulings must be given preclusive effect, the Court must now turn to the issue of damages. On this point, Brandenburg asserts that the principal amount of payments withheld by Sprint totals $2,195,506. *See* [R. 100, pp. 23–25]. Brandenburg then cites to the Duo County tariff's interest rate of .0292% per day or 10.66% annually. *Id.* With this principal amount and this interest rate, Brandenburg contends it is owed $7,157,063 as of September 1, 2020, with interest continuing to accrue. *Id.*

Sprint does not appear to contest the principal amount of $2,195,506. It argues, however, that the appropriate interest rate is 8% annually, citing KRS § 360.010. *See* [R. 105, pp. 10–11]. It further claims that it was overbilled between November 2009 and June 2010 in the amount of $381,945, and asks the Court to "enter partial summary judgment that Brandenburg cannot recover intrastate access charges of $381,945 billed from November 6, 2009 through June 2010." [R. 102, p. 23].

With respect to the November 2009 through June 2010 overbilling, the Court understands that this issue may already be resolved. Brandenburg's General Manager acknowledged by affidavit that, "as a result of not yet having time to fully implement a revised billing methodology into its billing systems," Brandenburg had not yet implemented the PIU methodology during this time period (November 2009–June 2010). [R. 101-1, p. 5]. However, Brandenburg honored Sprint's disputed amounts for invoices issued in November 2009 through June 2010, thereby effectively complying with the PSC's mandate. *Id.* This is reflected in a chart submitted by Brandenburg, in a column labeled "Dispute Honored." *See* [R. 101-4]. In Sprint's Response to Brandenburg's Motion for Summary Judgment, Sprint acknowledges Brandenburg's representations and "accepts the 'Dispute Honored' column" listed in that chart. [R. 106, p. 13].

As to the appropriate interest rate that the Court must use in calculating damages, the Court finds that the briefing on this point is undeveloped. The Court will therefore order the parties to brief the following issues: (1) the principal amount owed; (2) which interest rate applies, citing to the appropriate tariff, statute, and authority; (3) the total damages due as of the date of the entry of this order (including per diem interest going forward); and (4) whether the November 2009 through June 2010 overbilling remains at issue.

## IV.   CONCLUSION

For the reasons set forth above, **IT IS ORDERED** as follows:

1.  Defendant Sprint Communications Company, L.P.'s Motion for Judicial Notice, [**R. 100**], is **GRANTED**.

2.  Plaintiff Brandenburg Telephone Company's Motion for Summary Judgment, [**R. 101**], is **GRANTED**.

3.  Defendant Sprint Communications Company, L.P.'s Motion for Partial Summary Judgment, [**R. 102**], is **DENIED**.

4.  On or before **March 14, 2023**, the parties **SHALL** submit simultaneous briefs, not to exceed **ten (10) pages**, on the interest rate and damages issues outlined above.

5.  The parties may file simultaneous response briefs, not to exceed **five (5) pages**, on or before **March 21, 2023**.

6.  Upon issuing its additional findings related to the applicable interest rate and damages, the Court will enter a final and appealable judgment.

This the 28th day of February, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc: Counsel of Record